UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

MEGAN WILSON

Plaintiff,

vs.

3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY);
AGC CHEMICALS AMERICAS, INC.;
ALLSTAR FIRE EQUIPMENT CO.;
AMEREX CORPORATION;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER FIRE & SECURITY AMERICAS CORPORATION (f/k/a UTC FIRE & SECURITY AMERICAS CORPORATION, INC.);
CARRIER GLOBAL CORPORATION;
CB GARMENT, INC.;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS INCORPORATED;
CHUBB FIRE, LTD;
CLARIANT CORP.;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DUPONT DE NEMOURS, INC. (f/k/a DOWDUPONT, INC.);
DYNAX CORPORATION;
EIDP, INC. (f/k/a E.I. DU PONT DE NEMOURS AND COMPANY);
FIRE-DEX, LLC;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
INNOTEX CORP.;

MDL No. 2873

Master Docket No. 2:18-mn-2873-RMG

JUDGE

Civil Action No.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

DEMAND FOR JURY TRIAL

JOHNSON CONTROLS, INC.;
LION GROUP, INC.;
L.N. CURTIS & SONS;
MALLORY SAFETY AND SUPPLY LLC;
MILLIKEN & COMPANY;
MSA SAFETY, INC.;
MUNICIPAL EMERGENCY SERVICES, INC.;
NATION FORD CHEMICAL COMPANY;
PBI PERFORMANCE PRODUCTS, INC.;
PERIMETER SOLUTIONS LP;
RICOCHET MANUFACTURING CO., INC.;
SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.;
SOUTHERN MILLS, INC.;
STEDFAST USA, INC.;
THE CHEMOURS COMPANY FC, LLC;
THE CHEMOURS COMPANY;
TYCO FIRE PRODUCTS LP, AS SUCCESSOR-IN-INTEREST TO THE ANSUL COMPANY;
UNITED TECHNOLOGIES CORPORATION (n/k/a RTX CORPORATION);
VERIDIAN LIMITED;
WITMER PUBLIC SAFETY GROUP, INC.;
W.L. GORE & ASSOCIATES, INC.,

Defendants.

COMES NOW, Plaintiff, Megan Wilson, by and through undersigned counsel, and alleges upon information and belief as follows:

**INTRODUCTION**

1. Plaintiff brings this action for damages for personal injury resulting from exposure to aqueous film-forming foams ("AFFF"), firefighter turnout gear ("TOG") and drinking water containing the toxic chemicals collectively known as per and polyfluoroalkyl

substances ("PFAS"). PFAS includes, but is not limited to, perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals including those that degrade to PFOA and/or PFOS.

2. AFFF is a specialized substance designed to extinguish extremely hot fires involving materials like alcohol, petroleum greases, and other flammable or combustible liquids and gases ("Class B Fires"). AFFF has been used for decades by military and civilian firefighters to extinguish fires in training and in response to Class B Fires.

3. TOG is personal protective equipment designed for heat and moisture resistance in order to protect firefighters in hazardous situations. Most turnout gear are made up of a thermal liner, a moisture barrier, and an outer layer. The inner layers contain PFAS, and the outer layer is often treated with additional PFAS.

4. Defendants, individually and collectively, designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold, handled, used, and/or otherwise released into the stream of commerce AFFF or TOG or underlying chemicals that were added to AFFF or TOG, with knowledge that the AFFF or TOG or underlying chemicals contained highly toxic and biopersistent PFAS, which would expose end users of the product to the risks associated with PFAS.

5. The AFFF or TOG containing PFAS was used in fire emergency responses, fire-suppression systems, live fire training, and fire preparedness equipment testing ("Firefighting Activities").

6. Additionally, Defendants, at all times relevant to this lawsuit, manufactured, designed, marketed, distributed, released, instructed, promoted and/or otherwise sold (directly or indirectly) PFAS-containing AFFF products to locations near Athens Utilities Board water sources, which contaminated Athens City public drinking water system and Megan Wilson's

drinking water. Each Defendant knew or should have known that said products would contaminate the drinking water obtained from nearby sources.

7. PFAS bind to proteins in the blood of humans exposed to the material and remain and persist over long periods of time. Due to their unique chemical structure, PFAS accumulate in the blood and bodies of exposed individuals.

8. PFAS are highly toxic and carcinogenic chemicals. Defendants knew, or should have known, that PFAS remain in the human body and present significant health risks to humans.

9. Plaintiff was exposed to and ingested Defendants' PFAS-containing AFFF products. Plaintiff was unaware of the dangerous properties of the Defendants' AFFF. Plaintiff's consumption, inhalation and/or dermal absorption of PFAS from Defendant's AFFF products caused Plaintiff to be diagnosed with and treated for Ulcerative Colitis.

10. Plaintiff alleges that PFAS or PFAS-containing materials developed, manufactured, marketed distributed, released, sold, and/or used by Defendants in turnouts and Class B foam, as herein alleged, caused her to be exposed to PFAS and/or PFAS-containing materials. Such exposure was a substantial factor and proximate cause of Ulcerative Colitis and related injuries suffered by the Plaintiff, as alleged herein.

11. From 2011 to 2011, Plaintiff trained as a firefighter at Great Lakes Naval Training Center Chicago, Illinois. In 2011, Plaintiff began working as a military firefighter on the USS Comstock, San Diego, California where she worked until 2016. In 2016, she also began working as a Naval recruiting officer, where she worked until 2019. The USS Comstock and the Great Lakes Naval Training Center stored and used Defendants' AFFF containing PFAS chemicals and/or their precursor chemicals in Firefighting Activities.

12. From 2020 to 2025, Plaintiff resided at County Road 617, Athens, Tennessee, which was served by Athens Utilities Board. Athens Utilities Board water has been found to contain

levels of PFAS chemicals, namely PFBS above the EPA proposed limit.

13. During her career as a firefighter, Plaintiff regularly used and was exposed to Defendants' AFFF containing PFAS chemicals and/or their precursory chemicals. Over the course of her 8-year firefighting career, Plaintiff attended firefighting trainings, including but not limited to trainings regarding fire suppression for structures, vehicles, and fuel fires, where she was exposed to AFFF and TOG. During her time at USS Comstock, Plaintiff's activities included: regularly refilling AFFF on the fire trucks as part of her normal duties. From 2011 to 2016, Plaintiff was routinely exposed to AFFF and TOG containing PFAS.

14. Defendants' PFAS-containing AFFF and/or TOG products were used by Plaintiff in their intended manner, without significant change in the products' condition. Plaintiff was unaware of the dangerous properties of Defendants' AFFF and/or TOG products and relied on Defendants' instructions regarding the proper handling of the products.

15. Plaintiff's consumption, inhalation and/or dermal absorption of PFAS from Defendants' AFFF and/or TOG products, and from drinking water contaminated with PFAS, caused Plaintiff significant and devastating injury.

16. In 2016, Plaintiff was diagnosed with ULCERATIVE COLITIS, Plaintiff suffered, and continues to suffer, the effects of her illness, which was caused by exposure to Defendants' AFFF and/or TOG products.

17. Through this action, Plaintiff seeks to recover compensatory and punitive damages arising out of the permanent and significant damages sustained as a direct result of exposure to Defendants' AFFF and/or TOG products at various locations during the course of Plaintiff's Firefighting Activities. Plaintiff further seeks injunctive, equitable, and declaratory relief arising from the same.

**JURISIDICTION AND VENUE**

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 1332(c)(1) in that there is complete diversity among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19. Venue is proper in this District Court pursuant to this Court's Case Management Order ("CMO") No. 3. Plaintiff states that but for the Order permitting direct filing in the United States District Court for the District of South Carolina, Plaintiff would have filed this Complaint in the United States District Court for the Eastern District of Tennessee. Further, in accordance with CMO No. 3, Plaintiff designates the United States District Court for the Eastern District of Tennessee as the home venue. Venue is originally proper in the District Court pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff was a resident and/or citizen, a substantial part of the events or omissions giving rise to the claims occurred, and Defendants conduct business within the district.

20. This Court has personal jurisdiction over Defendants because at all times relevant to this lawsuit, Defendants manufactured, designed, marketed distributed, released, promoted and/or otherwise sold, directly or indirectly, PFAS-containing AFFF or TOG products to various locations for use in fighting Class B fires, such that each Defendant knew or should have known that the products would be delivered to areas in the state of Tennessee and used by Plaintiff during the course of performing Firefighting Activities. Therefore, the exercise of jurisdiction over Defendants by this Court does not offend traditional notions of fair play and substantial justice.

**PARTIES**

21. Plaintiff Megan Wilson is a resident and citizen of Athens, Tennessee. Plaintiff regularly used, and was thereby directly exposed to, AFFF and/or TOG in training and to extinguish fires during her working career as a military and/or civilian firefighter.

22. Plaintiff Megan Wilson was diagnosed with ULCERATIVE COLITIS as a result of exposure to Defendants' AFFF and/or TOG products.

23. Defendants are designers, marketers, developers, manufacturers, distributors, releasers, instructors, promoters, and sellers of PFAS-containing AFFF or TOG products or underlying PFAS-containing chemicals used in the production of AFFF or TOG products.

24. After her time in the Navy, Megan Wilson stayed in Tennessee until 2020, when she moved to the city of Athens, Tennessee. Plaintiff has been further exposed to AFFF containing PFOA and PFOS from the city's drinking water.

25. Defendants[1] [2]are designers, marketers, developers, manufacturers, distributors, releasers, instructors, promoters, and sellers of PFAS-containing AFFF products. The following Defendants, at all times relevant to this lawsuit, manufactured, designed, marketed, distributed, released, instructed, promoted and/or otherwise sold (directly or indirectly) PFAS-containing AFFF products to locations near Athens Utilities Board water sources, which contaminated Athens City public drinking water system and Megan Wilson's drinking water. Each Defendant knew or should have known said products would contaminate the drinking water obtained from nearby sources.

26. Defendant, 3M Company, f/k/a Minnesota Mining and Manufacturing Company,

---

[1] Plaintiff's potential claims as against Defendant Kidde-Fenwal, Inc. ("KFI") are stayed pursuant to Section 362(a) of the Bankruptcy Code based on the voluntary Chapter 11 petition filed by KFI in the United States Bankruptcy Court for the District of Delaware. *See In re Kidde-Fenwal, Inc.*, Case No. 23-10638 (Bankr. D. Del.), D.I. 1. For the avoidance of doubt, and notwithstanding anything stated herein or in any of the subsequent filings made in the above-captioned action, this action is not and should not be deemed an attempt to commence or continue an action against KFI, to collect a debt against KFI, or take any other action in violation of the automatic stay imposed by Section 362 of Title 11 of the United States Code.

[2] Plaintiff's potential claims as against Defendant National Foam, Inc. are stayed by order of this Court. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.,* Case Nos. 2:18-mn-02873-RMG, 2:18-cv-03487-RMG, Text Order (D.S.C. May 15, 2023) (observing "claims against Kidde and National Foam are automatically stayed by the filing of bankruptcy on May 14, 2023."). While Plaintiff
believes that Section 362(a) of the Bankruptcy Code does not apply to National Foam, since National Foam has not filed a petition for relief under the Bankruptcy Code, for the avoidance of doubt, and notwithstanding anything stated herein or in any of the subsequent filings made in the above-captioned action, this action is not and should not be deemed an attempt to commence or continue an action against National Foam, to collect a debt against National Foam, or take any other action in violation of this Court's order.

("3M"), is a Delaware corporation and does business throughout the United States, including conducting business in Tennessee. 3M has its principal place of business at 3M Center, St. Paul, Minnesota 55144.

27. 3M designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, from the 1960s until at least 2002, 3M designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

28. Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation and does business throughout the United States, including conducting business in Tennessee. AGC has its principal place of business at 55 E. Uwchlan Ave., Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

29. AGC designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, AGC designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

30. Defendant Amerex Corporation ("Amerex") is an Alabama corporation and does business throughout the United States, including conducting business in Tennessee. Amerex has

its principal place of business at 7595 Gadsden Highway, Trussville, Alabama 35173. Upon information and belief, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

31. Amerex designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Amerex designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

32. Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation and does business throughout the United States, including in Tennessee. Archroma has its principal place of business at 5435 77 Center Drive, #10 Charlotte, North Carolina 28217. Upon information and belief, Archroma was formed when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

33. Archroma designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Archroma designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

34. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation and does business throughout the United States, including in Tennessee. Arkema has its principal place of business

at 900 First Avenue, King of Prussia, Pennsylvania 19406. Upon information and belief, assets of Arkema's fluorochemical business were purchased by Defendant DuPont in 2002.

35. Arkema designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Arkema designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

36. Defendant BASF Corporation ("BASF") is a Delaware corporation and does business throughout the United States, including in Tennessee. BASF has its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF is the successor-in-interest to Swiss chemical company Ciba Holding, Inc, Ciba Corporation, Ciba- Geigy Corporation, and Ciba Specialty Chemicals Corporation.

37. BASF designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, BASF designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

38. Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation and does business throughout the United States, including in Tennessee. Buckeye has its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

39. Buckeye designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Buckeye designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

40. Defendant Carrier Fire & Security Americas Corporation (f/k/a UTC Fire & Security Americas Corporation) ("Carrier Fire") is a Delaware corporation and does business throughout the United States, including in Tennessee. Carrier Fire has its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

41. Carrier Fire designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Carrier Fire designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

42. Defendant Carrier Global Corporation ("Carrier Global") is a Delaware corporation and does business throughout the United States, including in Tennessee. Carrier Global has its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, Carrier Global was formed in 2020 when Defendant United Technologies Corporation spun off its fire and security business before merging with Raytheon Company, and Carrier Global became the parent company of Kidde-Fenwal, Inc., a manufacturer of AFFF. Upon

information and belief, Kidde-Fenwal, Inc., is the successor in interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Upon information and belief, Carrier Global is the ultimate corporate parent and owner of Kidde- Fenwal, Inc., Carrier Fire & Security Americas Corporation, and Carrier Fire & Security Corporation.

43. Carrier Global designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Carrier Global designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

44. Defendant ChemDesign Products, Inc. ("ChemDesign") is a Delaware corporation and does business throughout the United States, including in Tennessee. ChemDesign has its principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143.

45. ChemDesign designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, ChemDesign designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

46. Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation and does business throughout the United States, including in Tennessee. Chemguard has its principal place

of business at One Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, Chemguard was acquired by Tyco International Ltd. in 2011 and is a subsidiary of Johnson Controls International PLC. Upon information and belief, Chemguard acquired Ciba's fluorosurfactants business in 2003.

47. Chemguard designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Chemguard designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

48. Defendant Chemicals Incorporated ("Chemicals") is a Texas corporation and does business throughout the United States, including in Tennessee. Chemicals has its principal place of business at 12321 Hatcherville Road, Baytown, Texas 77521.

49. Chemicals designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Chemicals designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

50. Defendant The Chemours Company ("Chemours"), is a Delaware corporation and does business throughout the United States, including in Tennessee. Chemours has its principal place of business 1007 Market Street, Wilmington, Delaware 19899. Upon information and belief,

Chemours was spun off from DuPont in 2015 to assume PFAS-related liabilities.

51. Chemours designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Chemours designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

52. Defendant The Chemours Company FC, LLC ("Chemours FC"), a successor-in-interest to DuPont Chemical Solutions Enterprise, is a limited liability company doing business throughout the United States, including in Tennessee. As a limited liability company, Chemours FC's citizenship is determined by the citizenship of each of its members. Upon information and belief, the sole member of Chemours FC is The Chemours Company, which is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Based upon a search of publicly available sources, the sole member of Chemours FC is not a citizen of the same state as Plaintiff.

53. Chemours FC designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Chemours FC designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

54. Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, and does business throughout the United States, including in Tennessee. Chubb is a citizen of the United Kingdom, with its principal place of business in Blackburn, Lancashire, England. It is registered with Companies House in the United Kingdom, having registered number 134210, with its registered office at Chubb House, Shadsworth Road, Blackburn, Lancashire, England, BB1 2PR.

55. Chubb designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Chubb designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

56. Defendant Clariant Corporation ("Clariant") is a New York corporation and does business throughout the United States, including in Tennessee. Clariant has its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205. Upon information and belief, Clariant was formerly known as Sandoz Chemical Corporation and as Sodyeco, Inc.

57. Clariant designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Clariant designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

58. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that conducts business throughout the United States, including in Tennessee. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva was formed in February 2018 as a wholly-owned subsidiary of DowDuPont. On June 1, 2019, following a distribution to DowDuPont stockholders, DowDuPont spun off Corteva as a new, publicly traded company, which currently holds DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain DuPont liabilities.

59. Corteva designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Corteva designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

60. Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation and does business throughout the United States, including in Tennessee. Deepwater's principal place of business is at 196122 E County Road 40, Woodward, Oklahoma 73801.

61. Deepwater designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Deepwater designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

62. Defendant Dupont de Nemours, Inc. (f/k/a DowDuPont, Inc.) ("DowDuPont"), is a Delaware corporation and does business throughout the United States, including in Tennessee. DowDuPont has its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. DowDupont was created in 2015 to transfer Chemours and DuPont liabilities for manufacturing and distributing flurosurfactants to AFFF manufacturers. On June 1, 2019, DowDuPont was the surviving entity after the spin-off of Corteva. It retained assets in the specialty products business lines following the spin-off as well as the balance of the financial assets and liabilities of E.I. DuPont de Nemours and Company not assumed by Corteva.

63. DowDuPont designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, DowDuPont designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

64. Defendant Dynax Corporation ("Dynax") is a Delaware corporation that conducts business throughout the United States, including in Tennessee. Its principal place of business is 79 Westchester Avenue, Pound Ridge, New York 10576.

65. Dynax designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Dynax designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which

contained PFAS for use in Firefighting Activities.

66. Defendant EIDP, Inc. (f/k/a E.I. du Pont de Nemours and Company) ("DuPont"), is a Delaware corporation and does business throughout the United States, including in Tennessee. DuPont has its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. DuPont is a successor-in-interest to DuPont Chemical Solutions Enterprise, a Delaware corporation with its principal place of business in Delaware.

67. DuPont designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, DuPont designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

68. Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation and does business throughout the United States, including in Tennessee. Nation Ford has its principal place of business at 2300 Banks Street, Fort Mill, South Carolina 29715.

69. Nation Ford designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Nation Ford designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

70. Defendant Tyco Fire Products, LP, as successor-in-interest to The Ansul Company

("Tyco"), is a limited partnership doing business throughout the United States, including in Tennessee. As a limited partnership, Tyco's citizenship is determined by the citizenship of each of its members, Central Sprinkler LLC and Fire Products GP Holding, LLC. Fire Products GP Holding, LLC is wholly owned by its single member, Central Sprinkler, LLC, and takes its citizenship. Central Sprinkler LLC is wholly owned by its single member Tyco International Management Company LLC, and takes its citizenship. Tyco International Management Company, LLC is wholly owned by its single member, Tyco Fire & Security US Holdings, LLC, and takes its citizenship. Tyco Fire & Security US Holdings LLC is wholly owned by its single member, Tyco Fire & Security (US) Management, LLC, and takes its citizenship. Tyco Fire & Security (US) Management, LLC is wholly owned by its single member, Johnson Controls US Holdings Inc. and takes its citizenship. Johnson Controls US Holdings Inc. is a Delaware corporation with its principal place of business located in the State of Wisconsin. Thus, Tyco Fire Products, LP is a citizen of Delaware and Wisconsin. Tyco is the successor-by-merger and name change to Ansul LLC, formerly known as Ansul, Incorporated, Wormald U.S., Inc., The Ansul Company, and Ansul Chemical Company. Ansul LLC merged with and into Tyco Fire Products in 2009. After said merger, Tyco manufactured and continues to manufacture the Ansul brand of products, including Ansul brand AFFF containing PFAS.

71. At all times relevant, Tyco and/or Ansul designed, marketed, developed, manufactured, distributed released, trained users on, produced instructional materials for, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Tyco and/or Ansul designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

72. Defendant United Technologies Corporation (n/k/a RTX Corporation) ("United Technologies") is a Delaware corporation and does business throughout the United States, including in Tennessee. United Technologies has its principal place of business at 1000 Wilson Boulevard, Arlington, Virginia 22209.

73. United Technologies designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, United Technologies designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

74. Defendant Allstar Fire Equipment Co. ("Allstar") is a California corporation and does business throughout the United States, including in Tennessee. Allstar has its principal place of business at 12328 Lower Azusa Road, Arcadia, California 91006.

75. Allstar developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

76. Defendant CB Garment, Inc. ("CrewBoss") is a Delaware corporation and does business throughout the United States, including in Tennessee. CrewBoss has its principal place of business at 830 Wilson Street, Eugene, Oregon 97402.

77. CrewBoss developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

78. Defendant Daikin America, Inc. ("Daikin") is a Delaware corporation and does

business throughout the United States, including in Tennessee. Daikin has its principal place of business at 20 Olympic Drive, Orangeburg, New York 10962.

79. Daikin developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

80. Defendant Fire-Dex, LLC ("Fire-Dex") is a limited liability company doing business throughout the United States, including in Tennessee. As a limited liability company, Fire- Dex's citizenship is determined by the citizenship of each of its members. Upon information and belief, the sole member of Fire-Dex, LLC is a citizen of the state of Ohio. Based upon a search of publicly available sources, the sole member of Fire-Dex is not a citizen of the same state as Plaintiff.

81. Fire-Dex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

82. Defendant Fire Service Plus, Inc. ("Fire Service Plus") is a Georgia corporation and does business throughout the United States, including in Tennessee. Fire Service Plus has its principal place of business at 473 Dividend Drive, Peachtree City, Georgia 30269.

83. Fire Service Plus developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

84. Defendant Globe Manufacturing Company LLC ("Globe") is a limited liability company doing business throughout the United States, including in Tennessee. As a limited liability company, Globe's citizenship is determined by the citizenship of each of its members. Globe is wholly owned by its single member, Globe Holding Company, LLC. Globe Holding Company, LLC is wholly owned by its single member, MSA Worldwide, LLC. MSA Worldwide,

LLC is wholly owned by its single member, MSA Safety, Inc. MSA Safety, Inc. is a Pennsylvania corporation with its principal place of business at 1000 Cranberry Woods Drive, Cranberry Township, Pennsylvania, 16066. Upon information and belief, based upon a search of publicly available sources, none of Globe's members are citizens of the same state as Plaintiff. After acquiring Globe Holding Company, LLC, in 2017, MSA Safety, Inc. continues to do business under the Globe name.

85. Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

86. Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation and does business throughout the United States, including in Tennessee. Honeywell has its principal place of business at 855 South Mint Street, Charlotte, North Carolina 28202.

87. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

88. Defendant Innotex Corp. ("Innotex") is a Delaware corporation and does business throughout the United States, including in Tennessee. Innotex has its principal place of business at 2397 Harts Ferry Road, Ohatchee, Alabama 36271.

89. Innotex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

90. Defendant Johnson Controls, Inc. ("Johnson Controls") is a Wisconsin corporation and does business throughout the United States, including in Tennessee. Johnson Controls has its principal place of business at 5757 North Green Bay Avenue, Milwaukee Wisconsin 53209.

91. Johnson Controls developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

92. Defendant L.N. Curtis & Sons ("L.N. Curtis") is a California corporation and does business throughout the United States, including in Tennessee. L.N. Curtis has its principal place of business at 185 Lennon Lane, Suite 110, Walnut Creek, California 94598.

93. L.N. Curtis developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

94. Defendant Lion Group, Inc. ("Lion") is an Ohio corporation and does business throughout the United States, including in Tennessee. Lion has its principal place of business at 7200 Poe Avenue, Suite 400 Dayton, Ohio, 45414.

95. Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

96. Defendant Mallory Safety and Supply LLC ("Mallory") is a limited liability company doing business throughout the United States, including in Tennessee. As a limited liability company, Mallory's citizenship is determined by the citizenship of each of its members. Upon information and belief, the sole member of Mallory is a citizen of Oregon. Based upon a search of publicly available sources, none of Mallory's members are citizens of the same state as Plaintiff.

97. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

98. Defendant Milliken & Company ("Milliken") is a Delaware corporation and does business throughout the United States, including in Tennessee. Milliken has its principal place of business at 920 Milliken Road, Spartanburg, South Carolina 29303.

99. Milliken developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

100. Defendant MSA Safety Inc. ("MSA") is a Pennsylvania corporation and does business throughout the United States, including in Tennessee. MSA has its principal place of business at 1000 Cranberry Woods Drive, Cranberry Township, Pennsylvania, 16066. MSA acquired Globe Holding Company and its subsidiaries, including Globe, in 2017 and continues to do business under the Globe name.

101. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

102. Defendant Municipal Emergency Services, Inc. ("MES") is a Nevada corporation and does business throughout the United States, including in Tennessee. MES has its principal place of business at 12 Turnberry Lane, Sandy Hook, Connecticut 06482.

103. MES developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

104. Defendant PBI Performance Products, Inc. ("PBI") is a Delaware corporation and does business throughout the United States, including in Tennessee. PBI has its principal place of business at 9800-D Southern Pine Boulevard, Charlotte, North Carolina 28273.

105. PBI developed, manufactured, marketed, distributed, released, sold, and/or used

PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

106. Defendant Perimeter Solutions LP ("Perimeter") is a limited partnership doing business throughout the United States, including in Tennessee. As a limited partnership, Perimeter's citizenship is determined by the citizenship of each of its members. The sole member of Perimeter is Perimeter Solutions, Inc., which is a Delaware corporation with its principal place of business at 8000 Maryland Avenue, Suite 350, St. Louis, Missouri 63105. Upon information and belief, based upon a search of publicly available sources, the sole member of Perimeter is not a citizen of the same state as Plaintiff.

107. Perimeter developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

108. Defendant Ricochet Manufacturing Co., Inc. ("Ricochet") is a Pennsylvania corporation and does business throughout the United States, including in Tennessee. Ricochet has its principal place of business at 4700 Wissahickon Avenue, Number 112, Philadelphia, Pennsylvania 19144.

109. Ricochet developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

110. Defendant Safety Components Fabric Technologies, Inc. ("SCI") is a Delaware corporation and does business throughout the United States, including in Tennessee. SCI has its principal place of business at 40 Emery Street, Greenville, South Carolina 29605.

111. SCI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting

Activities.

112. Defendant Southern Mills, Inc. ("Southern Mills") is a Georgia corporation and does business throughout the United States, including in Tennessee. Southern Mills has its principal place of business at 6501 Mall Boulevard, Union City, Georgia 30291.

113. Southern Mills developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

114. Defendant Stedfast USA, Inc. ("Stedfast") is a Delaware corporation and does business throughout the United States, including in Tennessee. Stedfast has its principal place of business at 800 Mountain View Drive, Piney Flats, Tennessee 37686.

115. Stedfast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

116. Defendant Veridian Limited ("Veridian") is an Iowa corporation and does business throughout the United States, including in Tennessee. Veridian has its principal place of business 3710 West Milwaukee Street, Spencer, Iowa 51301.

117. Veridian developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

118. Defendant W.L. Gore & Associates, Inc. ("Gore") is a Delaware corporation and does business throughout the United States, including in Tennessee. Gore has its principal place of business at 555 Paper Mill Road, Newark, Delaware 19711.

119. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting

Activities.

120. Defendant Witmer Public Safety Group, Inc. ("Witmer") is a Pennsylvania corporation and does business throughout the United States, including in Tennessee. Witmer has its principal place of business at 104 Independence Way, Coatesville, Pennsylvania 19320.

121. Witmer developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

122. When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

123. Further, when reference is made in this Complaint to any act or omission of any officers, directors, agents, employees, or representatives, the Defendants are responsible for such act or omission under agency principles, the doctrine of *respondeat superior* and/or any other similar legal theory, doctrine, or principle.

124. The term "AFFF Defendant" or "AFFF Defendants" refers to all Defendants named herein who designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities which is the subject of this Complaint, jointly and severally, unless otherwise stated.

125. The term "TOG Defendant" or "TOG Defendants" refers to all Defendants named herein who developed, manufactured, marketed, distributed, released, sold, and/or used PFAS,

PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

126. Plaintiff alleges that each named Defendant is in some manner responsible for the acts alleged herein and that they directly and proximately caused Plaintiff's injuries, as alleged herein.

127. Plaintiff alleges that each named Defendant derived substantial revenue from the PFAS, PFAS materials, and products containing PFAS in AFFF products that Defendants designed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, and/or sold within the state and locations where Plaintiff was exposed.

128. Defendants expected or should have expected their acts to have consequences including within the state and locations where Plaintiff was exposed, and derived substantial revenue from interstate commerce.

129. Defendants purposefully availed themselves of the privilege of conducting activities including within the state and locations where Plaintiff was exposed, thus invoking the benefits and protections of its laws.

## FACTUAL ALLEGATIONS

130. All allegations *supra* are incorporated herein as if specifically set forth herein at length.

131. Plaintiff was a member of the Naval Firefighters from 2011 to 2016. During her time in the Navy Plaintiff was stationed in San Diego and worked on the USS Comstock as a Firefighter where her duties included use of the firefighting foam on the deck of the USS Comstock. At the time of such use, she was not informed of the toxic nature of the foam and used the toxic foam without protective gear except for gloves.

132. During her training at the Great Lakes Naval Training Center in 2011, Plaintiff would use firefighting foam during training activities. Also, during her time on the USS Comstock, Plaintiff would use firefighting foam in the performance of her duties.

133. The communities of Athens (collectively the "Communities") are all located in Tennessee.

134. Residents of the Communities receive their potable water either from private wells or from their municipal water provider.

135. The Communities receive municipal drinking water from the City of Athens Utilities Department and the Athens Utilities Board and Sanitation District.

136. The Athens Utilities Board and Sanitation District provide drinking water to approximately 25,851 residential and business customers.

137. While residing in Athens, Tennessee from 2020 to 2025 at County Road 617, Athens, Plaintiff Megan Wilson drank and was exposed to water contaminated with PFOA, PFOS and other PFAS ingredients coming from Aqueous Film Forming Foam (AFFF) used at various locations, including but not limited to Fire Stations located near Athens Utilities Board water sources.

138. As a result of her exposure to PFOA and PFOS, Megan was diagnosed with ULCERATIVE COLITIS in 2016.

**A. AFFF/ PFAS and their Hazardous Effects on Humans**

139. AFFF and its components are associated with a wide variety of adverse health effects in humans.

140. Exposure to Defendants' AFFF has been linked to serious medical conditions including, but not limited to, kidney cancer, testicular cancer, testicular tumors, pancreatic cancer, prostate cancer, leukemia, lymphoma, bladder cancer, thyroid disease, and infertility.

141. PFAS are a group of chemical compounds whose molecules consist of nearly indestructible chains of fluorine and carbon atoms. PFAS are entirely human-made and do not otherwise exist.

142. There is no naturally-occurring "baseline," normal, and/or acceptable level or rate of any PFAS in human blood, as all PFAS detected and/or present in human blood is present and/or detectable as a direct and proximate result of the acts and/or omissions of Defendants.

143. Prior to commercial development and large-scale manufacture and use of products containing PFAS, no such PFAS had been found or detected in human blood.

144. By at least the end of the 1960s, animal toxicity testing performed by some Defendants manufacturing and/or using PFAS indicated that exposure to such materials, including at least PFOA, resulted in various adverse health effects among multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals, and other organs and bodily systems.

145. By at least the end of the 1960s, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that such materials, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

146. By at least the end of the 1970s, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that one or more such materials, including at least PFOA and PFOS, because of their unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials where such materials would remain and

persist over long periods of time and would accumulate in the blood/bodies of the exposed individuals with each additional exposure.

147. By at least the end of the 1980s, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that PFOA, one such PFAS, had caused Leydig cell (testicular) tumors in a chronic cancer study in rats, resulting in at least one such Defendant, DuPont, classifying such PFAS internally as a confirmed animal carcinogen and possible human carcinogen.

148. It was understood by some Defendants by at least the end of the 1980s that a chemical that caused cancer in animal studies must be presumed to present a cancer risk to humans unless the precise mechanism of action by which the tumors were caused was known and would not occur in humans.

149. By at least the end of the 1980s, scientists had not determined the precise mechanism of action by which any PFAS caused tumors. Therefore, scientific principles of carcinogenesis classification mandated that Defendants presume any such PFAS material that caused tumors in animal studies could present a cancer risk to exposed humans.

150. By at least the end of the 1980s, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

151. By at least the end of the 1980s, some Defendants, including at least 3M and DuPont, understood that, not only did PFAS get into and persist and accumulate in the human blood and in the human body, but that once in the human body and blood, particularly longer-chain PFAS, such

as PFOS and PFOA, they had a long half-life. This meant that it would take a very long time before even half of the material would start to be eliminated, which allowed increasing levels of the chemicals to build up and accumulate in the blood and/or bodies of exposed individuals over time, particularly if any level of exposure continued.

152. By at least the end of the 1990s, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, indicated that at least one such PFAS, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats.

153. By at least the end of the 1990s, the precise mechanism(s) by which PFAS caused each of the tumors found in animal studies had still not been identified, mandating that Defendants continue to presume that any such PFAS that caused such tumors in animal studies could present a potential cancer risk to exposed humans.

154. By at least 2010, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, revealed multiple potential adverse health impacts among workers exposed to such PFAS, including at least PFOA, such as increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

155. When the United States Environmental Protection Agency ("USEPA") and state and local public health agencies and officials first began learning of PFAS exposure in the United States and potential associated adverse health effects, Defendants repeatedly assured and represented to such entities and the public that such exposure presented no risk of harm and was of no significance.

156. After the USEPA and other entities began asking Defendants to stop manufacturing and/or using certain PFAS, Defendants began manufacturing, making, and/or using more of certain other and/or "new" PFAS, including PFAS materials with six or fewer carbons, such as GenX

(collectively "Short-Chain PFAS").

157. Defendants manufacturing and/or using Short-Chain PFAS, including at least DuPont and 3M, were aware that one or more such Short-Chain PFAS materials also had been found in human blood.

158. By at least the mid-2010s, Defendants, including at least DuPont and Chemours, were aware that at least one Short-Chain PFAS had been found to cause the same triad of tumors- Leydig (testicular), liver, and pancreatic- in a chronic rat cancer study as had been found in a chronic rat cancer study with a non-Short-Chain PFAS.

159. Research and testing performed by and/or on behalf of Defendants making and/or using Short-Chain PFAS indicated that such Short-Chain PFAS materials presented the same, similar, and/or additional risks, including cancer risk, to human health as had been found in research on other PFAS materials, including cancer risk.

160. Nevertheless, Defendants repeatedly assured and represented to governmental entities and the public (and continue to do so) that the presence of PFAS, including Short-Chain PFAS, in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

161. At all relevant times, Defendants, individually and/or collectively, possessed the resources and ability but have intentionally, purposefully, recklessly, and/or negligently chosen not to fund or sponsor any study, investigation, testing, and/or other research of any kind of the nature that Defendants claim is necessary to confirm and/or prove that the presence of any one and/or combination of PFAS in human blood causes any disease and/or adverse health impact of any kind in humans, presents any risk of harm to humans, and/or is of any legal, toxicological, or medical significance to humans, according to standards Defendants deem acceptable.

162. Even after an independent science panel, known as the "C8 Science Panel," publicly

announced in the 2010s that human exposure to 0.05 parts per billion or more of PFOA, one of the categories of PFAS, had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFAS in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind. Defendants also have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate.

163. PFAS and their components are associated with a wide variety of adverse health effects in humans.

164. At all relevant times, Defendants shared and/or should have shared among themselves all relevant information relating to the presence, biopersistence, and bioaccumulation of PFAS in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

165. As of the present date, blood serum testing and analysis by Defendants, independent scientific researchers, and/or government entities has confirmed that PFAS materials are clinically demonstrably present in approximately 99% of the current population of the United States.

166. There is no naturally occurring "background," normal, and/or acceptable level or rate of any PFAS in human blood, as all PFAS detected and/or present in human blood is present and/or detectable in such blood as a direct and proximate result of the acts and/or omissions of Defendants.

167. At all relevant times, Defendants, through their acts and/or omissions, controlled,

minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiff from discovering the existence and extent of any injuries/harm as alleged herein.

168. At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in human blood.

169. At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted Plaintiff to the legal, toxicological, medical, or other significance and/or risk from having any PFAS material in Plaintiff's blood.

170. At all relevant times, Defendants encouraged the continued and even further increased use of PFAS by their customers and others, including but not limited to the manufacture, use, and release, of AFFF containing PFAS and/or emergency responder protection gear or equipment coated with materials made with or containing PFAS, and tried to encourage and foster the increased and further use of PFAS in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

171. To this day, Defendants deny that the presence of any PFAS in human blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

172. To this day, Defendants deny that any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to the public that the presence of any PFAS material in human blood, at any level, is of any legal, toxicological, medical, or other significance.

173. Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions.

174. Defendants were and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that their design, marketing, development, manufacture, distribution, release, training and response of users, production of instructional materials, sale and/or other handling and/or use of AFFF containing PFAS would result in the contamination of the blood and/or body of Plaintiff with PFAS, and the biopersistence and bioaccumulation of such PFAS in her blood and/or body.

175. Defendants were and /or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFAS to contaminate the blood and/or body of Plaintiff would cause injury, irreparable harm, and/or unacceptable risk of such injury and/or irreparable harm to Plaintiff.

176. Defendants did not seek or obtain permission or consent from Plaintiff before engaging in such acts and/or omissions that caused, allowed, and/or otherwise resulted in Plaintiff's exposure to AFFF and the contamination of Plaintiff's blood and/or body with PFAS materials, and resulting biopersistence and bioaccumulation of such PFAS in her blood and/or

body.

177. Exposure to Defendants' products containing PFAS has been linked to serious medical conditions including, but not limited to, kidney cancer, testicular tumors, testicular cancer, liver cancer, pancreatic cancer, prostate cancer, leukemia, lymphoma, bladder cancer, thyroid disease, thyroid cancer, ulcerative colitis, colorectal cancer, breast cancer, endometrial cancer, multiple myeloma, infertility, hypercholesterolemia, and pre-eclampsia.

**B. AFFF Defendants' History of Manufacturing and Selling AFFF**

178. Aqueous Film-Forming Foam ("AFFF") is a combination of chemicals used to extinguish Class B Fires.

179. AFFF containing fluorinated surfactants has better firefighting capabilities than water due to its surfactant-tension lowering properties which allow the compound(s) to extinguish fire by smothering, ultimately starving it of oxygen.

180. AFFF is a Class B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

181. PFAS have been used for decades in the manufacture of AFFF.

182. AFFF was introduced commercially in the mid-1960s and rapidly became the primary firefighting foam in the United States and in other parts of the world. It contains PFAS, which are highly fluorinated synthetic chemical compounds whose family includes PFOS and PFOA.

183. 3M began producing PFOS and PFOA by electrochemical fluorination in the 1940s. In the 1960s, 3M used its fluorination process to develop AFFF.

184. 3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s.

185. National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the

1970s.

186. Buckeye began to manufacture, market, and sell AFFF in the 2000s.

187. In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF. 3M, in its press release announcing the phase out, stated "our products are safe," and that 3M's decision was "based on [its] principles of responsible environment management." 3M further stated that "the presence of these materials at [] very low levels does not pose a human health or environmental risk." In communications with the EPA at that time, 3M also stated that it had "concluded that…other business opportunities were more deserving of the company's energies and attention…"

188. Following 3M's exit from the AFFF market, the remaining AFFF Defendants continued to manufacture and sell AFFF that contained PFAS and/or its precursors.

189. AFFF Defendants knew their customers warehoused large stockpiles of AFFF. In fact, AFFF Defendants marketed their AFFF products by touting its shelf-life. Even after AFFF Defendants fully understood the toxicity of PFAS, and their impacts to the health of humans following exposure, AFFF Defendants concealed the true nature of PFAS. While AFFF Defendants phased out production or transitioned to other formulas, they did not instruct their customers that they should not use AFFF that contained PFAS and/or their precursors. AFFF Defendants further did not act to get their harmful products off the market.

190. Defendants did not warn Megan Wilson that the use of their products at locations near her residence would exposure her to hazardous AFFF products containing PFAS would pose a danger to human health.

191. Plaintiff Megan drank water contaminated from PFOS and PFOA used in Fire Stations which contaminated groundwater supplied to Athens, Tennessee during the time she resided there.

192. Plaintiff was never informed that her drinking water was dangerous. Nor was Plaintiff warned about the known health risks associated with this product.

193. Defendants have known of the health hazards associated with AFFF and/or its compounds for decades and that in their intended and/or common use would harm human health.

194. Information regarding AFFF and its compounds were readily accessible to each of the above-referenced Defendants for decades because each is an expert in the field of AFFF manufacturing and/or the materials needed to manufacture AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products.

195. Defendants' manufacture, distribution and/or sale of AFFF resulted in the Plaintiff and other individuals who came in contact with the chemical to develop cancer and other serious and/or catastrophic health conditions.

196. Defendants through their manufacturing, distribution and/or sale of AFFF, and through their involvement and/or participation in the creation of training and instructional materials and activities, knew, foresaw, and/or should have known and/or foreseen that the Plaintiff and those similarly situated would be harmed.

197. Defendants' products were unreasonably dangerous, and Defendants failed to warn users and handlers of this danger.

198. Defendants failed to warn about the adverse and harmful health effects of their harmful and defective AFFF products, when they knew or should have known that their products had an adverse effect on the health of persons when used for its intended purposes.

199. While using AFFF for its intended purposes, the said harmful and defective products were released into the environment contaminating the soil and groundwater of the base and migrated into the groundwater and eventually into the drinking/potable water of the

Plaintiff.

200. It was reasonably foreseeable to Defendants that Plaintiff, as a user of water supplied, in part, from water sources near Athens Utilities Board, would use and consume groundwater contaminated by their products used at Fire Stations and would be harmed as a result.

201. In the 1970s-1980s, Defendants were well aware of the health risks and adverse human health effects of exposure to the harmful and defective products which contained PFOA and PFOS.

202. Despite this knowledge, Defendants continued to manufacture, market and/or sell their defective AFFF, without warning and/or sufficiently warning consumers, purchasers, and users of the health risks and/or adverse human effects and failed to recall their defective and harmful products when the said defective and harmful products were taken off of the market.

203. Defendants, as the manufacturers of AFFF, knew or should have known that the inclusion of PFOS, PFOA and related fluorochemicals that degrade to PFOA or PFOS in AFFF presented an unreasonable risk to human health and the environment.

204. DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

205. In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14, 2003, and signed by Stephen H. Korzeniowski, DuPont provided its Telomer-based sale products in the United States for the year 2002.

206. The letter, which was redacted and sent to the EPA under its PFOA

Stewardship Program, included Aqueous Fire Fighting Foam (AFFF) sales volume, on an active ingredient pound basis, as well as its chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.

207. Upon information and belief, at all times relevant, DuPont Chemical designed, manufactured, and sold AFFF and/or PFOA and other PFAS in the AFFF, either directly or as a constituent in AFFF sold by other defendants, that was used at the USS Comstock and the Great Lakes Naval Training Center which ultimately caused Plaintiff's injuries.

208. When 3M phased out production of PFOA, Defendant EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company (Historical DuPont) began manufacturing its own PFAS chemicals, despite knowing about the health and environmental risks of PFAS from its use of PFAS for consumer products starting in 1951. DuPont marketed and sold PFAS to be used in AFFF throughout the United States, including in the County. In 2015, DuPont transferred its performance chemicals business and some associated liabilities to Defendant the Chemours Company (Chemours). Defendants Chemours, Corteva, Inc. (Corteva), Dow Inc. (Dow or New Dow), and DuPont de Nemours, Inc. (New DuPont) are other DuPont affiliates that manufactured PFAS chemicals and/or have succeeded to Historical DuPont's PFAS liabilities. Historical DuPont, Chemours, Corteva, Dow, and New DuPont are collectively referred to in this Complaint as "DuPont."

209. Defendants also knew or should have known that: (a) users of AFFF would likely include fire and rescue training organizations and their personnel; (b) fire and rescue personnel were foreseeable users of AFFF containing or degrading into PFOA and/or

PFOS in both training and real-life fire emergency scenarios; (c) PFOA and PFOS are dangerous to the environment and human health if allowed to runoff or drain into groundwater; (d) fire and rescue personnel in and around Athens, Tennessee foreseeably lacked knowledge of these dangers; and, (e) fire and rescue personnel would require warnings of these dangers and/or affirmative instructions in the use of AFFF.

210. Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, and/or supplied PFOA/PFOS, (2) issued instructions on how AFFF should be used and disposed of (namely, by washing the foam into the soil), thus improperly permitting PFOA and/or PFOS to contaminate the groundwater in and around Plaintiff's wells; (3) failed to recall and/or warn the users of AFFF, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of groundwater contamination as a result of standard use and disposal of these products; and, (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF containing PFOA and/or PFOS, notwithstanding the fact that Defendants knew the identity of the purchasers of the PFOA/PFOS.

211. As a direct result of Defendants' acts alleged in this Complaint, Plaintiff's wells have been contaminated and will continue to be contaminated with PFOA and PFOS, creating a public health hazard, unless such contamination is remediated. As a direct and proximate result, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, and remediate PFOA and PFOS contamination in its wells at significant expense, loss, and damage.

212. Defendants had a duty and breached their duty to evaluate and test such products adequately and thoroughly to determine their environmental fate and transport characteristics and potential human health and environmental impacts before they sold such products. They also had

a duty and breached their duty to minimize the environmental harm caused by PFOA and PFOS.

213. AFFF Defendants did not warn public entities, firefighter trainees who they knew would foreseeably come into contact with their AFFF products, or firefighters employed by civilian and/or military employers that the use of and/or exposure to AFFF Defendants' products containing PFAS and/or their precursors would pose a danger to human health.

214. Plaintiff directly used, was exposed to, and/or was given AFFF to conduct Firefighting Activities on a regular basis.

215. Plaintiff was never informed that AFFF containing PFAS was inherently dangerous. Nor was Plaintiff warned about the known health risks associated with this product.

216. Plaintiff never received or was told to use any protective gear to guard against the known dangerous propensities of this product.

217. AFFF Defendants have known of the health hazards associated with AFFF and/or its compounds for decades and that in their intended and/or common use would harm human health.

218. Information regarding AFFF and its compounds was readily accessible to each of the above-referenced AFFF Defendants for decades because each is an expert in the field of AFFF manufacturing and/or the materials needed to manufacture AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products.

219. AFFF Defendants' products were unreasonably dangerous, and AFFF Defendants failed to warn of this danger.

220. AFFF Defendants have each designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold, and/or otherwise handled AFFF containing PFAS and/or underlying chemicals containing PFAS used in AFFF production. The AFFF and underlying chemicals were used by entities around the country,

including military, county, and municipal firefighting departments.

221. AFFF Defendants have each designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled AFFF containing PFAS and/or underlying chemicals containing PFAS used in AFFF production, in such a way as to cause the contamination of Plaintiff's blood and/or body with PFAS, and the resultant biopersistence and bioaccumulation of such PFAS in the blood and/or body of Plaintiff.

222. AFFF Defendants, through their manufacturing, distribution and/or sale of AFFF, and through their involvement and/or participation in the creation of training and instructional materials and activities, knew, foresaw, and/or should have known and/or foreseen that Plaintiff and those similarly situated would be harmed.

**THE IMPACT OF PFOA AND PFOS ON PLAINTIFF**

223. The invasion of the Communities' wells with PFOA and PFOS is recurring—new contamination flows regularly and constantly into the wells each day, resulting in new harm to the property on each occasion.

224. The injuries to Plaintiff caused by Defendants' conduct constitute an unreasonable interference with, and damage to, the limited subterranean supplies of fresh drinking water on which Plaintiff depends.

**HISTORICAL DUPONT'S FRAUDULENT SCHEME TO INSULATE ITS ASSETS FROM ITS PFAS LIABILITIES**

225. After Historical DuPont had been sued and faced the threat of further lawsuits regarding its manufacturing and releases of PFOA, it announced in October 2013 its intention to spin off its "performance chemicals" business, responsible for

manufacturing and sales of PFAS and PFAS-containing products, including PFOA. The performance chemicals business would be spun off as a new, independently owned company named The Chemours Company (the Chemours Spin-off) that would assume certain liabilities of Historical DuPont.

226. In February 2014, Historical DuPont formed The Chemours Company as a wholly owned subsidiary with a separate board of directors that was controlled by Historical DuPont employees.

227. According to a lawsuit filed by Chemours against historical DuPont, DowDuPont, and Corteva in 2019, the Chemours Spin-off was not an arm's length transaction. *See* Chemours's Verified First Amended Complaint, C.A. No. 2019-0351-SG (Del. Ch.) (the Chemours Compl.), ¶25.[3] From formation through consummation of the Chemours Spin-off, historical DuPont controlled development of the Chemours Spin-off's terms, dictated the terms of the Chemours Spin-off, and there were no procedural protections for Chemours. *Id.* ¶¶ 25, 27.

228. Historical DuPont did not allow Chemours (or its prospective management team) to have independent counsel to represent Chemours's interests in structuring the Chemours Spinoff. *Id.* ¶ 26. Instead, Historical DuPont and its outside counsel unilaterally prepared all of the documents underlying and effectuating the Chemours Spin-off. *Id.*

229. The initial draft of the "Separation Agreement" between Historical DuPont and Chemours (the Chemours Separation Agreement) did not include the schedules listing the assets and liabilities to Chemours, preventing Chemours's designated management team from evaluating central economic terms of the transaction even though Chemours's

---

[3] A copy of the Chemours Complaint is available at: https://www.chemours.com/en/-/media/files/corporate/fayetteville-works/chemours-amended-complaint.pdf.

designated management team requested these schedules. *Id.* ¶ 29.

230. On May 12, 2015, the Chemours Board, which then consisted of three Historical DuPont employees, Michael Heffernan, Nigel Pond, and Steven Zelac (the DuPont Employee Board Members) who were not going to be with Chemours following the Chemours Spin-off, authorized the Dividend (as defined below). *See id.* ¶ 35(a).

231. On June 5, 2015, the DuPont Board approved the Chemours Spin-off. *Id.* ¶ 70.

232. On June 9, 2015, DuPont Employee Board Members, as the sole members of the Chemours' Board, held a DuPont Board "meeting" to "discuss" whether Chemours should approve the Chemours Spin-off and the Chemours Separation Agreement. *Id.* ¶ 35(c). That meeting was also attended by other historical DuPont employees and Historical DuPont's outside counsel. *Id.* The meeting consisted of "presentations" by Historical DuPont's outside counsel and Historical DuPont. *Id.* The DuPont Employee Board Members (1) took "notice" that "DuPont, as the sole stockholder of [Chemours], has communicated" that the DuPont Board had determined that the Chemours Spin-off "are in DuPont's best interests," and (2) "unanimously" adopted resolutions approving the Chemours Spin-off on Chemours's supposed behalf. *Id.*

233. On June 26, 2015, Nigel Pond, Historical DuPont's M&A Counsel, formerly one of the DuPont Employee Board Members, and then designated a "Vice President" of Chemours (a temporary position he would resign immediately thereafter), executed the Chemours Separation Agreement on Chemours's behalf. *Id.* ¶ 35(d).

234. On July 1, 2015, Michael Heffernan, Nigel Pond, and Steven Zelac all resigned from the Chemours Board.

235. In connection with the Chemours Spin-off, Historical DuPont and Chemours executed the Chemours Separation Agreement, dated as of June 26, 2015.

236. On May 12, 2015, Chemours borrowed over $4 billion through Senior Secured Term Loans (the Term Loans), Notes, and related indentures.

237. The Term Loans were incurred pursuant to the terms of the Credit Agreement, dated May 12, 2015, by and among Chemours, certain Guarantors party thereto and JPMorgan Chase Bank, N.A., as administrative agent. *See* Chemours's Form 10, Amendment No. 3, Ex. 10.14, filed on May 13, 2015 (as amended) (the Credit Agreement).

238. The Information Statement for the Chemours Spin-off dated June 5, 2015 (the Info Statement), disclosed that a "Dividend" of over $3.9 billion would be paid to Historical DuPont by Chemours.

239. As part of the Chemours Spin-off, Chemours received approximately 19% of Historical DuPont's business lines, while being saddled with approximately two-thirds of Historical DuPont's environmental liabilities and 90% of Historical DuPont's pending litigation by volume of cases. Chemours Compl., ¶ 38.

240. These environmental liabilities included those related to over 80 Historical DuPont-associated sites, the majority of which were sites that Chemours would never operate. Id. ¶ 39.

241. Historical DuPont even gave Chemours all liabilities related to Historical DuPont's historical explosives operations and asbestos and benzene exposures that had nothing to do with its performance chemicals business.

242. As a result of the Chemours Spin-off, Chemours's capital structure carried

a debt-to-EBITDA (earnings before interest, taxes, depreciation, and amortization) ratio of 7.3 to 1.0. Id. 41.

243. Under the Chemours Separation Agreement, The Chemours Company agreed to defend and indemnify Historical DuPont against, and assumed for itself, all "Chemours Liabilities," defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time." This indemnification is uncapped and does not have a survival period.

244. The Chemours Company agreed to indemnify Historical DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Chemours Spin-off; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Historical DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

245. The Chemours Company agreed to indemnify Historical DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spin-off if they were "primarily associated" with the Performance Chemicals Business. Such liabilities were deemed "primarily associated" if Historical DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

246. The Chemours Company also agreed to use its best efforts to be fully substituted for Historical DuPont with respect to "any order, decree, judgment, agreement or [any litigation or investigation] with respect to Chemours Assumed Environmental

Liabilities" in effect at the time of the Chemours Spin-off. Chemours Separation Agreement at § 6.10(b).

247. The schedules to the Chemours Separation Agreement, as referenced in the "Chemours Assumed Environmental Liabilities" definition, have never been publicly filed.

248. The Chemours Spin-off was predicated upon a determination that Chemours would be solvent following the Chemours Spin-off (see Chemours Separation Agreement at § 4.5(e)), but that solvency opinion was based upon faulty and fictitious certified "maximum" liability figures that were unrealistic and designed to mask Chemours's insolvency.

249. Houlihan Lokey (Houlihan) was commissioned to provide a financial opinion regarding Chemours's solvency on the date of the Chemours Spin-off. See Chemours Compl., ¶¶ 49-50. Houlihan's opinion, however, was based on Historical DuPont's "High End (Maximum) Realistic Exposure" estimates for dozens of sites that were given to it by Historical DuPont. Id. ¶ 50.

250. DuPont engineered the "High End Maximum Realistic Exposure" figures to massively understate the real potential maximum exposure. Id. ¶ 56.

251. In May 2015, Historical DuPont demanded that Chemours's newly appointed chief financial officer (Mark E. Newman) certify the accuracy of the "High End (Maximum) Realistic Exposure" numbers. Id. ¶ 52. Newman conditioned his certification upon Historical DuPont's acknowledgement that it supplied the maximum liability numbers, which Historical DuPont did through "Backup Certificates" signed by its employees. Id.

252. Historical DuPont understated the real maximum liabilities related to the

Chemours Spin-off.

253. For multiple categories of litigation (such as PFOA, other PFAS, and benzene), Historical DuPont does not appear to have undertaken any analysis. Id. ¶ 58. Rather, Historical DuPont's certification invoked a supposed "analysis" of the maximum liabilities done by Deloitte Transactions and Business Analytics LLP (Deloitte). Id. But Deloitte did not certify those "maximums." Id.

254. Prior to the closing of the Chemours Spin-off, Chemours's management complained to Historical DuPont's senior management that Chemours would lack appropriate cash reserves. See Chemours Compl., ¶ 51.

255. In June 2015, Historical DuPont summarily rejected the plea of Chemours's chief financial officer for an additional $200-300 million in cash reserves to function on day one. Id.¶ 32.

256. Historical DuPont ignored the concerns of Chemours's management that paying quarterly stockholder dividends of $100 million would adversely affect Chemours's cash position. Id. ¶ 51. Chemours's management went on to cut future dividends to almost zero after the Chemours Spin-off. Id. ¶ 74.

257. On July 1, 2015, Historical DuPont spun off Chemours.

258. Chemours's financial condition at the time of the Chemours Spin-off was rapidly deteriorating and Chemours as an independent company was suffering from slumping EBITDA.

259. In the midst of weakness in the global titanium dioxide market cycle and continued foreign currency impacts, Chemours had vastly overstated its own financial health.

260. Chemours's financial condition was much worse at the time of the Chemours Spin-off than Chemours and Historical DuPont publicly disclosed.

261. At the time of the Chemours Spin-off, Chemours's debt-to-EBITDA ratio was 7.3 to 1.0. Id. ¶ 41. This ratio far exceeded the Credit Agreement's maximum "Total Net Leverage Ratio," barring Chemours from accessing $1 billion of revolving loans. See Credit Agreement, §6.13.

262. Chemours suffered a liquidity shortage within months of the Chemours Spin-off. Chemours Compl., ¶ 75. As a result, Chemours laid off 1,000 employees, shut plants or production lines in Delaware and Tennessee, sold off business lines, undertook two corporate restructurings, and made multiple amendments to the Credit Agreement. Id. ¶ 76.

263. In November 2015, Chemours announced that it would sell to Dow its facility in Beaumont, Texas for approximately $140 million in cash. Id. ¶ 77.

264. In February 2016, Historical DuPont advanced Chemours $190 million to pay for goods and services to be provided to Historical DuPont through mid-2017. Id.

265. As of the last trading date before the Chemours Spin-off closed, the markets reflected Chemours's insolvency.[4] As set forth in Chemours's publicly filed financial statements, the market believed that Chemours was insolvent by $77 million.

266. On August 6, 2015, Chemours filed its first Form 10-Q following the Chemours.

267. Spin-off, containing a deconsolidated balance sheet as of June 30, 2015,

[4] Chemours's share price, originally pegged by DuPont at $21 per share, declined to $11.48 within a month, and to $3.16 within six months. Chemours Compl., ¶ 65.

immediately prior to the Chemours Spin-off, reflecting Chemours's insolvency by at least $309 million.

268. Just three months after the Chemours Spin-off, Chemours was insolvent by $829 million based upon the value of its traded debt.

269. In 2005, Historical DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million. Under the terms of the 2005 class action settlement, Historical DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

270. Also in 2005, Historical DuPont agreed to pay $16.5 million to resolve eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

271. The C8 science panel completed its research in 2013 and found several significant diseases, including cancer, with a probable link to PFOA. Thereafter, more than 3,500 personal injury claims were filed in Ohio and West Virginia (in connection with the 2005 class-action settlement) that were consolidated into a multidistrict litigation court in Ohio (the Ohio MDL).[5]

272. At the time of the Chemours Spin-off, Historical DuPont certified to Houlihan a "maximum" liability figure for the 3,500 cancer and other bodily injury claims

---

[5] Under the settlement, if the science panel found a "probable link" as to a disease, plaintiffs having that disease could then bring personal injury actions against DuPont, and DuPont could not defend by contesting general causation. See Chemours Compl., ¶¶ 82-83.

relating to PFOA of $128 million. Id. ¶¶ 82, 84.

273. In mid-2016, Historical DuPont lost the first three bellwether trials, the first having gone to trial just two months after the Chemours Spin-off. Juries returned multi-million-dollar verdicts against Historical DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their illnesses, in the total amount of $19.7 million. Id. ¶ 85.

274. On February 13, 2017, Historical DuPont and The Chemours Company reached a global settlement of the Parkersburg, West Virginia cases agreeing to pay $670.7 million to resolve the Ohio MDL. Id. ¶¶ 89-90.

275. At the time of the Chemours Spin-off, Historical DuPont certified Chemours's "maximum" exposure as $2.09 million with respect to Historical DuPont's Fayetteville Works operation in North Carolina. Id. ¶ 93. At the time of the Chemours Spin-off, Historical DuPont knew that the Fayetteville plant had been discharging PFAS for 30 years or more into the Cape Fear River, which serves as the source of drinking water for tens of thousands of people. Id. ¶ 94.

276. Beginning in September 2017, the State of North Carolina, public water authorities, well owners, and a consolidated putative class of North Carolina residents, among others, filed suits against Chemours and/or Historical DuPont. Id. ¶ 97.

277. In February 2019, Chemours entered into a judicially approved consent order with the State of North Carolina to resolve North Carolina's claims arising from Historical DuPont's long-running discharges into the Cape Fear River and contamination of area groundwater. Id. ¶ 99. That consent order requires Chemours to take steps to remediate Historical DuPont's historical contamination and to implement environmental

protection measures at a cost of more than $200 million. Additionally, a number of private lawsuits relating to Historical DuPont's activities in the region remain outstanding, including a class action.

278. At the time of the Chemours Spin-off, Historical DuPont certified that the "maximum" Chemours could have to pay for total New Jersey environmental liabilities was $337 million, divided among different sites in New Jersey. Id. ¶ 101. In 2018, in connection with the DowDuPont spin-off, Historical DuPont revised its liability estimate upward to approximately $620 million. Id. The State of New Jersey has criticized even Historical DuPont's upward-revised estimates, claiming it "implausible" that these amounts could represent "good-faith estimates of [Historical DuPont's historical New Jersey] environmental obligations and liabilities." Id.

279. For benzene-related liabilities, Historical DuPont certified a "maximum" liability of $17 million, including defense costs, at the time of the Chemours Spin-off. Id. ¶ 108. In 2018, Historical DuPont provided Chemours with a more comprehensive study valuing the potential maximum costs for benzene-related liabilities at over $111 million. Id. Historical DuPont addressed PFAS litigation, if at all, as part of a catch-all "maximum" of $194 million covering "General Litigation . . . to Perpetuity," which apparently included everything from PFAS liabilities to commercial litigation. Id. ¶ 110.

280. Significant additional environmental and other litigation arising from Historical DuPont's performance chemical business was likewise pending or threatened at the time of the Chemours Spin-off and additional lawsuits continue to be filed against Historical DuPont relating to its performance chemicals business.

281. In 2017, Chemours then also agreed, in an amendment to the Chemours Separation Agreement, to pay Historical DuPont $25 million for future PFOA costs not

covered by the Chemours Separation Agreement for each of the next five years (up to an additional $125 million). Historical DuPont also agreed to cover additional amounts up to $25 million for five years, with Chemours taking responsibility for any amounts greater than $50 million.

282. The effect of the Chemours Spin-off was to segregate a large portion of Historical DuPont's environmental (and other) liabilities, including liabilities related to its manufacturing, use, and disposal of PFAS compounds, and give them to an undercapitalized entity, thus attempting to limit the funds available to satisfy Historical DuPont's legacy liabilities.

283. Given that Chemours is allegedly responsible for all or substantially all of Historical DuPont's historic environmental liabilities; is saddled with debt, and has comparatively few assets, the separation and spin-off have been described by some market commentators as "a bankruptcy waiting to happen" and "complete securities fraud."

284. On December 11, 2015, Historical DuPont announced a merger with Old Dow into the combined DowDuPont (the Merger). DowDuPont would eventually, in 2019, split into three independent companies: an agriculture company, a materials science company, and a specialty products company. These actions were all a continuation of the fraudulent Chemours Spin-off, which was a necessary precondition to these later mergers and spins.

285. The DowDuPont Merger closed on August 31, 2017, with Old Dow and DuPont each becoming wholly owned subsidiaries of DowDuPont.

286. After the completion of the Merger, DowDuPont engaged in a number of internal transactions, realignments, and diversities, that resulted in the transfer, directly or indirectly, of a substantial portion of what had been Historical DuPont's assets from the

combined DowDuPont.

287. Pursuant to an April 1, 2019, Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the DowDuPont Separation Agreement), DowDuPont jettisoned away from Chemours's and Historical DuPont's creditors DowDuPont's agriculture chemical and seed business (which went with Corteva) and DowDuPont's materials science business (which went with New Dow) (the DowDuPont Separation).

288. The spin-off of DowDuPont's materials science division into New Dow (the Dow Spin-off) occurred on April 1, 2019, and New Dow became an independent, publicly traded company on April 1, 2019. New Dow was formed as a wholly owned subsidiary of DowDuPont to serve as the holding company for the materials science business, and Corteva Inc. was formed as a wholly owned subsidiary of DowDuPont to serve as the holding company for the agriculture business. The Dow Spin-off was accomplished through a pro rata dividend in-kind of all of New Dow's then-issued and outstanding shares of common stock, to holders of DowDuPont's common stock as of the close of business on March 21, 2019 (the Dow Distribution).

289. The spin-off of DowDuPont's agriculture chemical and seed business to Corteva (a.k.a. Corteva Agriscience) (the Corteva Spin-off) occurred on June 1, 2019. The Corteva Spin-off was accomplished through a pro rata dividend in-kind of all of the then-issued and outstanding shares of Corteva's common stock, to holders of Historical DuPont's common stock as of the close of business on May 24, 2019 (the Corteva Distribution).

290. In connection with the Dow Distribution and the Corteva Distribution, DowDuPont entered into certain agreements that, among other things, effect the separations, provide for the allocation of assets, employees, liabilities, and obligations

(including its investments, property and employee benefits and tax-related assets and liabilities) among DowDuPont, New Dow, and Corteva.

291. Pursuant to the DowDuPont Separation and Distribution Agreement as well as a June 1, 2019 "Letter Agreement," DowDuPont agreed to indemnify both New Dow and Corteva against certain litigation, environmental, workers' compensation, and other liabilities that arose prior to the distribution.

292. On or about June 1, 2019, DowDuPont changed its name to DuPont de Nemours, Inc. (i.e., New DuPont), which now holds the former conglomerate's specialty products business.

293. The DowDuPont board of directors believed the completion of the post-Merger separations was—in DowDuPont's words— "the best available opportunity to unlock the value of DowDuPont's businesses." The practical effect of the post-Merger separations was to frustrate and hinder creditors of Historical DuPont and Chemours by moving valuable assets further away from Historical DuPont.

294. As a result of these transactions, the assets Historical DuPont had held following the Chemours Spin-off, including the Dividend and/or the proceeds or products thereof, are now distributed across three companies: DowDuPont, New Dow, and Corteva.

295. Many details about these transactions are hidden from the public in confidential and/or non-public schedules and exhibits to the various agreements and this has hampered creditors' efforts to understand the final disposition of Historical DuPont's valuable assets and the adequacy of the consideration received in return.

296. Pursuant to the DowDuPont Separation Agreement, DowDuPont and Corteva assumed direct financial liability of Historical DuPont, including liability that was

not related to the agriculture, materials science, or specialty products businesses. Corteva was allocated 29% of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business. DowDuPont was allocated 71% of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business.

297. Liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested have been allocated between Corteva and DowDuPont as set forth in the non-public confidential schedules to the DowDuPont Separation Agreement. To the extent that liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested are not listed on the non-public confidential schedules to the DowDuPont Separation Agreement, each of DowDuPont and Corteva may be responsible for $200 million each in the aggregate, and once liability exceeds the aggregate cap, then excess liability will be allocated to the other. In the event such liabilities exceed $200 million in the aggregate for each of DowDuPont and Corteva, liabilities are allocated 71% to DowDuPont and 29% to Corteva.

298. The DowDuPont Separation Agreement allocates DowDuPont's assets among DowDuPont, New Dow, and Corteva. Similarly, the DowDuPont Separation Agreement allocates DowDuPont's liabilities, including the liabilities of Historical DuPont.

299. While the non-public nature of the schedules to the DowDuPont Separation Agreement obscures the precise extent of the liabilities retained by New Dow and those transferred to Corteva, the DowDuPont Separation Agreement caused Corteva and DowDuPont to bear the brunt of liabilities for Historical DuPont, including Historical

DuPont's legacy PFAS liabilities and the liabilities of its former performance chemicals business.

300. As a result of the Merger, DowDuPont was not a good-faith transferee of the proceeds of the Dividend because DowDuPont had sufficient knowledge about the Chemours Spin-off to induce it to inquire further about that transaction.

301. In each of the Dow Spin-off and the Corteva Spin-off, neither the newly created New Dow nor Corteva were good-faith transferees of the proceeds of the Dividend, because each of New Dow and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

302. New Dow was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by New Dow in the Dow Spin-off because New Dow had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce New Dow to inquire further about those liabilities.

303. Likewise, Corteva was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by Corteva in the Corteva Spin-off because Corteva had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce Corteva to inquire further about those liabilities.

304. Prior to the Dow Spin-off, Old Dow's March 31, 2019, consolidated balance sheet reflected tangible assets of $49,153,000,000 and balance sheet liabilities of $51,591,000,000. Following the Dow Spin-off, New Dow's June 30, 2019, consolidated balance sheet reflected balance sheet tangible assets of $39,887,000,000 and balance sheet liabilities of $46,389,000,000. Thus, Old Dow's and New Dow's balance sheets' liabilities

exceeded their balance sheet tangible assets, for Old Dow before the Dow Spin-off, and for New Dow after the Dow Spin-off.

305. Before the Corteva Spin-off, Historical DuPont's March 31, 2019, balance sheet reflected tangible assets of $31,327,000,000 and liabilities of $32,002,000,000. After the Corteva Spin-off, (i) Corteva's June 30, 2019, consolidated balance sheet, which includes Historical DuPont, reflected tangible assets of $19,064,000,000 and liabilities of $17,855,000,000 and (ii) Historical DuPont's June 30, 2019, balance sheet reflected tangible assets of $19,071,000,000 and liabilities of $21,928,000,000. Thus, Historical DuPont's balance sheet liabilities exceeded its balance sheet tangible assets both before and after the Corteva Spin-off. Additionally, after the Corteva Spin Transaction, Historical DuPont's liabilities included a $4.16 billion intercompany loan to Corteva.

306. Prior to the Dow Spin-off and the Corteva Spin-off, Historical DuPont's balance sheet reflected an aggregate total cash, cash equivalents, and marketable securities of $3,814,000,000. After the Dow Spin-off and the Corteva Spin-off, DowDuPont's balance sheet reflected an aggregate total cash, cash equivalents and marketable securities of $2,083,000,000.

307. The Chemours Spin-off, the Dow Spin-off, and the Corteva Spin-off (collectively, the Spin Transactions), were a coordinated series of transactions through which Historical DuPont sought to spin-off (and separate) profitable and valuable assets, free and clear of billions of dollars of legacy environmental liabilities, including PFOA and PFAS liabilities.

308. The Chemours Spin-off was part of a single integrated scheme that included the Dow Spin-off and the Corteva Spin-off.

309. While the Spin Transactions as a whole are relevant to the fraudulent schemes alleged herein, each of the Spin Transactions constituted an actual or constructive fraudulent transfer of assets.

## AFFF USED AT U.S.S COMSTOCK AND GREAT LAKES NAVAL TRAINING CENTER

At any given time during their operation, the USS Comstock and the Great Lakes Naval Training Center housed thousands of gallons of AFFF concentrate manufactured by Defendants, which were/are stored in buckets, drums, tankers and sprinkler systems.

310. For decades, firefighting and firefighting training activities took place at the USS Comstock and the Great Lakes Naval Training Center.

311. Naval personnel conducted firefighting and firefighting training exercises at these locations.

312. In part, the USS Comstock and the Great Lakes Naval Training Center engaged in firefighting and explosion training that required the use of AFFF.

313. Each site also possessed and maintained storage structures protected by ceiling fire suppression units holding hundreds of gallons of AFFF.

314. The use of AFFF for simulation and training purposes included suppression fires and explosions on the ground, all of which resulted in acres of foam-covered soil.

315. Accidental discharges occasionally occurred within the Base resulting in the discharge of hundreds of gallons of AFFF. This led to cleanup activities by the personnel at these locations. The plaintiff Megan Wilson, often engaged in cleanup activities, without adequate protection.

316. Following the accidental discharges, the personnel at these locations also

used the contaminated drinking water system which provided drinking/potable water to those serving and working at these locations and to surrounding residents.

317. Once the ground water of these locations was contaminated and polluted with PFOA and PFOS, the polluted and contaminated ground water found its way into nearby water sources and into Plaintiff's drinking/potable water.

318. Once PFOA and PFOS contaminated and polluted the drinking potable water in nearby areas, the residents of said areas were exposed to PFOA and PFOS in their drinking, cooking, and bathing water while living and working nearby and/or while eating and drinking at the homes of friends and family and/or businesses nearby.

319. At all times mentioned herein, the individuals ingesting the polluted and contaminated water/food/sustenance were unaware that they were consuming/ingesting polluted and contaminated substances containing PFOA and PFOS.

320. The instructions and warnings supplied with the AFFF sold by the Defendants did not adequately describe the dangers associated with use and disposal of AFFF.

## REGULATORY ACTION FOR SAFE DRINKING WATER

321. In 2012, the EPA included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule ("UCMR3"). By placing PFOS and PFOA on this list, the EPA required certain water providers across the country, including those in Plaintiff's water supply, to test their water for the presence of PFOA and PFOA.

322. On April 10, 2024, the US Environmental Protection Agency (EPA) announced the final National Primary Drinking Water Regulations (NPDWR) establishing legally enforceable levels, called Maximum Contaminant Levels (MCL) for six PFAS in drinking water. The MCL for PFOA is 4.0 parts per trillion (ppt) also reported as ng/L, and

the MCL for PFOS is also 4.0 ppt.

323. On April 19, 2024, the EPA designated PFOA and PFOS as Hazardous Substances under the Comprehensive Environmental Response, Compensation and Liability ACT (CERCLA).

324. In 2024, the Tennessee Department of Environmental Protection advised that PFOS and PFOA were detected in the water at Athens, Tennessee. Each facility detected PFOS and PFOA exceeding the United States Environmental Protection Agency's (USEPA) [MCLS OF 4.0 ppt]. This detection was for 12.0 ppt in water supplied by Athens Utilities Board, a source of drinking water for the City of Athens and Megan Wilson.

325. The contamination of the public and private drinking/potable water wells in the areas surrounding Athens, Tennessee with high concentration levels of PFOS and PFOA resulted from the Defendant's manufacture and distribution of AFFF through the use of the defective/harmful products at several locations within the city.

326. Despite said knowledge, Defendants continued to manufacture, market, sell and/or introduce into the stream of commerce their harmful and defective products, AFFF, without warning and/or sufficiently warning consumers, purchasers, users and reasonably foreseeable innocent bystanders, such as Plaintiff, of the health risks and/or adverse human health effects and failed to recall their defective and harmful products when the said defective and harmful products were taken off of the market.

**C. PFAS-Containing Turnout Gear**

327. During Firefighting Activities, firefighters and other emergency workers wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection. Turnout gear components include individual components such as a helmet, hood, jacket, pants and suspenders, boots, and gloves. Each component of the jacket and pants is made of

an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.

328. PFAS chemicals are used in turnout gear to provide heat, water, and stain resistance to the outer shell and moisture barrier of turnout gear.

329. A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed, and sold in 2008, 2014, and 2017, by six turnout gear makers, including TOG Defendants Globe, Lion and Honeywell and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including Plaintiff.

330. When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust, exposing firefighters to PFAS chemicals, particles, and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation. Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' personal vehicles, homes, and families.

331. Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980 internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." The memo concluded "continued exposure is not tolerable."

332. As alleged herein, Plaintiff wore turnouts in the ordinary course of performing Plaintiff's duties, as the turnouts were intended to be used in a foreseeable manner, which

exposed Plaintiff to significant levels of PFAS.

333. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, that the turnouts Plaintiff wore or used in the course of performing Plaintiff's duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that Plaintiff routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts Plaintiff wore or used in performing Plaintiff's duties. The turnout gear worn or used by Plaintiff did not and does not contain labeling information saying that the gear contained PFAS, and similarly did not and does not warn Plaintiff of the health risks associated with exposure to PFAS. Across the country, many firefighters only had one set of turnouts for years and would wash their turnouts at home and/or in station machines along with their daily station wear uniforms.

334. Plaintiff was never informed that this product was inherently dangerous. Nor was Plaintiff warned about the known health risks associated with this product.

**D. Defendants' Knowledge, Actions, and Inactions**

335. Defendants' manufacture, distribution and/or sale of AFFF or TOG containing PFAS, resulted in many individuals, including Plaintiff, who came in contact with the chemicals, to develop ulcerative colitis.

336. At all relevant times, Defendants shared and/or should have shared among themselves all relevant information relating to the presence, biopersistence, and bioaccumulation of PFAS in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

337. At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or

risks associated therewith, effectively preventing Plaintiff from discovering the existence and extent of any injuries/harm as alleged herein.

338. At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in human blood.

339. At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted Plaintiff to the legal, toxicological, medical, or other significance and/or risk from having any PFAS material in Plaintiff's blood and/or body.

340. At all relevant times, Defendants encouraged their customers and others to continue and even further increase their use of PFAS by continuing to manufacture, use, and release AFFF containing PFAS or TOG containing PFAS.

341. At all relevant times, Defendants tried to encourage and foster the increased and further use of PFAS in connection with as many products, uses, and applications as possible, despite having knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

342. To this day, Defendants deny that the presence of any PFAS in human blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

343. To this day, Defendants deny that any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to the public that the presence of any PFAS material in human blood, at any level, is of any legal, toxicological, medical, or

other significance.

344. Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions.

345. Defendants were and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that their design, marketing, development, manufacture, distribution, release, training and response of users, production of instructional materials, sale and/or other handling and/or use of AFFF or TOG containing PFAS would result in the contamination of the blood and/or body of Plaintiff with PFAS, and the biopersistence and bioaccumulation of such PFAS in Plaintiff's blood and/or body.

346. Defendants were and/or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFAS to contaminate the blood and/or body of Plaintiff would cause injury, irreparable harm, and/or unacceptable risk of such injury and/or irreparable harm to Plaintiff.

347. Defendants did not seek or obtain permission or consent from Plaintiff before engaging in such acts and/or omissions that caused, allowed, and/or otherwise resulted in Plaintiff's exposure to AFFF or TOG containing PFAS and the contamination of Plaintiff's blood and/or body with PFAS materials, and resulting biopersistence and bioaccumulation of such PFAS in Plaintiff's blood and/or body.

## CAUSES OF ACTION

### COUNT I – NEGLIGENCE

348. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

349. Defendants had a duty to individuals, including Plaintiff, to exercise reasonable ordinary, and appropriate care in the manufacturing, design, labeling, packaging, testing, instruction, warning, selling, marketing, distribution, and training related to the AFFF or TOG product.

350. Defendants breached their duty of care and were negligent, grossly negligent, reckless and willful as described herein in the design, manufacture, labeling, warning, instruction, training, selling, marketing, and distribution of the AFFF or TOG products and/or underlying PFAS- containing chemicals used in AFFF or TOG production in one or more of the following respects:

a) failing to design the products so as to avoid an unreasonable risk of harm to individuals, including Plaintiff;

b) failing to use reasonable care in the testing of the products so as to avoid an unreasonable risk of harm to individuals, including Plaintiff;

c) failing to use appropriate care in inspecting the products so as to avoid an unreasonable risk of harm to individuals, including Plaintiff;

d) failing to use appropriate care in instructing and/or warning the public as set forth herein of risks associated with the products, so as to avoid unreasonable risk of harm to individuals, including Plaintiff;

e) failing to use reasonable care in marketing, promoting, and advertising the products so as to avoid unreasonable risk of harm to individuals, including Plaintiff;

f) otherwise negligently or carelessly designing, manufacturing, marketing, distributing, and warning; and

g) selling and/or distributing a product which was inherently dangerous to the public.

351. As discussed, *supra*, Defendants knew or should have known that the manufacture, distribution, and sales of AFFF containing PFOS and PFOA was hazardous to human health and the environment.

352. Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture, distribute and sell AFFF containing PFOS and PFOA because it was inevitable that said harmful and defective products would migrate and contaminate the ground water and potable/drinking water supply of Tennessee.

353. Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile and highly persistent in the environment, and highly likely to contaminate water supplies if released to the environment.

354. Defendants marketed and sold their products, AFFF, with knowledge that large quantities of their toxic, harmful and defective product, AFFF, would be used in training exercises and in emergency situations at Military bases in such a manner that dangerous chemicals would be released into the environment.

355. The harm caused by the Defendants' harmful and defective products to Plaintiff was reasonably foreseeable.

356. The drinking/potable water of the public and private wells in Tennessee were contaminated with unsafe levels of PFOS and PFOA at the time Plaintiff resided there.

357. As a result of Defendants' negligent, reckless and/or intentional acts and omissions alleged herein, both the public and private drinking/potable water supplies in Tennessee were contaminated with PFOS and PFOA.

358. Defendants' failure to warn/sufficiently warn of the effects of their harmful and defective products resulted in the contamination of private and public

drinking/potable water supplies with PFOS and PFOA.

359. As a direct and proximate result of Defendants' negligence, Plaintiff has been injured, sustained severe and permanent pain, suffering, impairment, loss of enjoyment of life, loss of care, comfort, economic loss, and damages including, but not limited to medical expenses, lost income, and/or other damages.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

**COUNT II – BATTERY**

360. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

361. At all relevant times, Defendants possessed knowledge that the AFFF or TOG containing PFAS which they designed, engineered, manufactured, fabricated, sold, handled, released, trained users on, produced instructional materials for, used, and/or distributed was bio-persistent, bio- accumulative, toxic, potentially carcinogenic, and/or otherwise harmful/injurious and that their continued manufacture, use, sale, handling, release, and distribution would result in Plaintiff having PFAS in Plaintiff's blood and/or body, and the biopersistence and bioaccumulation of such PFAS in Plaintiff's blood and/or body.

362. However, despite possessing such knowledge, Defendants knowingly, purposefully, and/or intentionally continued to engage in such acts and/or omissions, including but not limited to all such acts and/or omissions described in this Complaint, that continued to result in Plaintiff accumulating PFAS in Plaintiff's blood and/or body, and such PFAS persisting and accumulating in Plaintiff's blood and/or body.

363. Defendants did not seek or obtain permission or consent from Plaintiff to put or allow PFAS materials into Plaintiff's blood and/or body, or to persist in and/or accumulate in Plaintiff's blood and/or body.

364. Entry into, persistence in, and accumulation of such PFAS in Plaintiff's body and/or blood without permission or consent is an unlawful and harmful and/or offensive physical invasion and/or contact with Plaintiff's person and unreasonably interferes with Plaintiff's rightful use and possession of Plaintiff's blood and/or body.

365. At all relevant times, the PFAS present in the blood of Plaintiff originated from Defendants' acts and/or omissions.

366. Defendants continue to knowingly, intentionally, and/or purposefully engage in acts and/or omissions that result in the unlawful and unconsented-to physical invasion and/or contact with Plaintiff that resulted in persisting and accumulating levels of PFAS in Plaintiff's blood and/or body.

367. Plaintiff, and any reasonable person, would find the contact at issue harmful and/or offensive.

368. Defendants acted intentionally with the knowledge and/or belief that the contact, presence, and/or invasion of PFAS with, onto and/or into Plaintiff's blood serum, including their persistence and accumulation in such serum, was substantially certain to result from those very acts and/or omissions.

369. Defendants' intentional acts and/or omissions resulted directly and/or indirectly in harmful contact with Plaintiff's blood and/or body.

370. The continued presence, persistence, and accumulation of PFAS in the blood and/or body of Plaintiff are offensive, unreasonable, and/or harmful, and thereby constitute a battery.

371. The presence of PFAS in the blood and/or body of Plaintiff altered the structure

and/or function of such blood and/or body parts and resulted in ulcerative colitis.

372. As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered physical injury, for which Defendants are therefore liable.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT II – FAILURE TO WARN

373. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

374. Defendants knew or should have known:

a) exposure to AFFF containing PFAS was hazardous to human health;

b) the manner in which they were designing, marketing, developing, manufacturing, distributing, releasing, training, instructing, promoting, and selling AFFF containing PFAS was hazardous to human health; and

c) the manner in which they were designing, marketing, developing, manufacturing, distributing, releasing, training, instructing, promoting and selling AFFF containing PFAS would result in the contamination of Plaintiff's blood and/or body as a result of exposure.

375. As designers, engineers, manufacturers, developers, fabricators, testers, sellers, and/or distributors of a commercial product, Defendants had a duty to provide reasonable instructions and adequate warnings about the risks of injuries and harmful effects to human health and the environment posed by their products.

376. Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF that they designed, engineered, developed, fabricated, tested, manufactured, sold, and distributed had the capacity to enter the water supply, to persist there

for decades, and to cause harm to human health, property, and the environment.

377. These risks were not obvious to users of the AFFF.

378. Defendants failed to provide warnings to the users that the use of Defendants' harmful and defective product could result in the contamination of groundwater and drinking/potable water supplies.

379. Defendants failed to provide warnings to the users of the dangers to human health, property, and the environment if their harmful and defective product was permitted to contaminate the groundwater or drinking/potable water supply.

380. Defendants failed to provide warnings to the users of how indestructible their product was when released into the environment due to its chemical stability.

381. Sufficient and adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the Defendants' harmful and defective products.

382. Had Defendants provided adequate warnings, the users of their AFFF would have taken adequate measures to store, use, and dispose of AFFF so as to reduce or eliminate groundwater and drinking/potable water contamination from AFFF.

383. As a result of Defendants' failure to warn against the likelihood of contamination from their AFFF, the groundwater and drinking/potable water became contaminated with toxic PFOS and PFOA.

384. As a direct and proximate result of Defendants' failure to warn, Plaintiff has been injured, sustained severe and permanent pain, suffering, impairment, loss of enjoyment of life, loss of care, comfort, economic loss, and damages including, but not limited to medical expenses, lost income, and/or other damages.

WHEREFORE, Plaintiff demands judgment against Defendants for actual,

compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

**COUNT III – INADEQUATE WARNING**

385. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

386. Defendants knew or should have known:

a) exposure to AFFF or TOG containing PFAS was hazardous to human health;

b) the manner in which they were designing, marketing, developing, manufacturing, distributing, releasing, training, instructing, promoting, and selling AFFF or TOG containing PFAS was hazardous to human health; and

c) the manner in which they were designing, marketing, developing, manufacturing, distributing, releasing, training, instructing, promoting and selling AFFF or TOG containing PFAS would result in the contamination of Plaintiff's blood and/or body as a result of exposure.

387. Defendants had a duty to warn of the hazards associated with AFFF or TOG containing PFAS entering the blood and/or body of Plaintiff because they knew of the dangerous, hazardous, and toxic properties of AFFF or TOG containing PFAS. Defendants failed to provide sufficient warning to purchasers that the use of their AFFF or TOG products would cause PFAS to be released and cause the exposure and bioaccumulation of these toxic chemicals in the blood and/or body of Plaintiff.

388. Adequate instructions and warnings on the AFFF and/or TOG containing PFAS could have reduced or avoided these foreseeable risks of harm and injury to Plaintiff. If Defendants had provided adequate warnings:

a) Plaintiff could have and would have taken measures to avoid or lessen exposure; and

b) end users and governments could have taken steps to reduce or prevent the release of PFAS into the blood and/or body of Plaintiff. Defendants' failure to warn was a direct and proximate cause of Plaintiff's injuries from PFAS that came from the

use, storage, and disposal of AFFF and/or TOG containing PFAS. Crucially, Defendants' failure to provide adequate and sufficient warnings for the AFFF or TOG containing PFAS they designed, marketed, manufactured, distributed, released, promoted, and sold renders the AFFF or TOG a defective product.

389. Defendants were negligent in their failure to provide Plaintiff with adequate warnings or instruction that the use of their AFFF or TOG products would cause PFAS to be released into the blood and/or body of Plaintiff. As a result of Defendants' conduct and the resulting contamination, Plaintiff suffered severe personal injuries by exposure to AFFF and/or TOG containing PFAS.

390. Defendants' negligent failure to warn directly and proximately caused the harm to and damages suffered by Plaintiff.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## **COUNT IV – DESIGN DEFECT**

391. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

392. Defendants knew or should have known:

a) exposure to AFFF or TOG containing PFAS is hazardous to human health;

b) the manner in which AFFF or TOG containing PFAS was designed, manufactured, marketed, distributed, and sold was hazardous to human health; and

c) the manner in which AFFF or TOG containing PFAS was designed, manufactured, marketed, and distributed, could and would release PFAS into Plaintiff and cause the exposure and bioaccumulation of these toxic and poisonous chemicals in the blood and/or body of Plaintiff.

393. Knowing of the dangerous and hazardous properties of the AFFF or TOG

containing PFAS, Defendants could have designed, manufactured, marketed, distributed, and sold alternative designs or formulations of AFFF or TOG that did not contain hazardous and toxic PFAS. These alternative designs and formulations were already available, practical, and technologically feasible. The use of these alternative designs would have reduced or prevented reasonably foreseeable harm to Plaintiff caused by Defendants' design, manufacture, marketing, distribution, and sale of AFFF or TOG containing hazardous and toxic PFAS.

394. The AFFF or TOG containing PFAS that was designed, manufactured, marketed, distributed, and sold by Defendants was so hazardous, toxic, and dangerous to human health that the act of designing, formulating, manufacturing, marketing, distributing, and selling this AFFF was unreasonably dangerous under the circumstances.

395. The AFFF or TOG designed, formulated, manufactured, marketed, distributed, and sold by Defendants was defectively designed and the foreseeable risk of harm could and would have been reduced or eliminated by the adoption of a reasonable alternative design that was not unreasonably dangerous. Defendants' defective design and formulation of AFFF or TOG containing PFAS was a direct and proximate cause of the contamination of the blood and/or body of Plaintiff and the persistence and accumulation of PFAS in Plaintiff's blood and/or body.

396. Defendants' defective design and formulation of AFFF or TOG containing PFAS caused the contamination described herein resulting in personal injuries to Plaintiff. As a direct result of the harm and injury caused by Defendants' defective design and the contamination described herein, Plaintiff has been exposed to AFFF and/or TOG containing PFAS and other toxic substances and has developed ulcerative colitis.

397. The AFFF designed, formulated, manufactured, marketed, distributed, and sold by Defendants was defectively designed and the foreseeable risk of harm could and would have been reduced or eliminated by the adoption of a reasonable alternative design that was not unreasonably

dangerous. Defendants' defective design and formulation of AFFF containing PFAS was a direct and proximate cause of the contamination of the water supply in Athens, Tennessee which resulted in the persistence and accumulation of PFAS in Plaintiff's blood and/or body.

398. Defendants' defective design and formulation of AFFF containing PFAS caused the contamination described herein resulting in personal injuries to Plaintiff. As a direct result of the harm and injury caused by Defendants' defective design and the contamination described herein, Plaintiff has been exposed to AFFF containing PFAS and other toxic substances and has ulcerative colitis.

399. As a result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing designed product, the drinking/potable water supplies in and around Athens, Tennessee was contaminated with dangerous and toxic chemicals and damaged the Plaintiff.

400. As a direct and proximate result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or manufacturing, or distributing of a defective product, Plaintiff has been injured, sustained severe and permanent pain, suffering, impairment, loss of enjoyment of life, loss of care, comfort, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

401. As a result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing a defective produce, Defendants are strictly liable for damages to the Plaintiff.

402. Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of Plaintiff.

403. Defendants' negligent failure to design a reasonably safe product directly and proximately caused the harm to and damages suffered by Plaintiff.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

**COUNT V – STRICT LIABILITY (STATUTORY)**

404. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

405. Plaintiff asserts any and all remedies available under Miss. Code Ann. § 11-1-63 for strict liability against each Defendant.

406. Defendants were engaged in designing, manufacturing, marketing, selling, and distributing AFFF or TOG.

407. The AFFF or TOG was in a defective condition and unreasonably dangerous to users and/or consumers when designed, manufactured, marketed, sold, and/or distributed to the public by Defendants.

408. As a direct and proximate result of Defendants' products' aforementioned defects, Plaintiff has been injured, sustained severe and permanent pain, suffering, impairment, loss of enjoyment of life, loss of care, comfort, economic loss, and damages including, but not limited to medical expenses, lost income, and other damages.

409. Defendants are strictly liable in tort to the Plaintiff for their wrongful conduct.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

**COUNT VI – STRICT LIABILITY (COMMON LAW)**

410. Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint as if restated in full herein.

411. Plaintiff brings strict product liability claims under common law.

412. As designed, manufactured, marketed, tested, assembled, equipped, distributed and/or sold by Defendants, the AFFF or TOG products were in a defective and unreasonably dangerous condition when put to reasonably anticipated use by foreseeable consumers and users, including Plaintiff.

413. Defendants had available reasonable alternative designs which would have made the AFFF or TOG products safer and would have most likely prevented the injuries and damages to Plaintiff, thus violating state common law.

414. Defendants failed to properly and adequately warn and instruct Plaintiff as to the proper safety and use of Defendants' products.

415. Defendants failed to properly and adequately warn and instruct Plaintiff regarding the inadequate research and testing of the products.

416. Defendants' products are inherently dangerous and defective, unfit, and unsafe for their intended and reasonably foreseeable uses, and do not meet the expectations for the performance of the products.

417. As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of the products, Plaintiff has been injured and sustained severe and permanent pain, suffering, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

418. By reason of the foregoing, Defendants are strictly liable for the injuries and damages suffered by Plaintiff, caused by these defects in the AFFF and/or TOG products.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and

further relief as this Court may deem fit, just, and proper.

## COUNT VII – FRAUDULENT CONCEALMENT

419. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

420. Throughout the relevant time period, Defendants knew that their products were defective and unreasonably unsafe for their intended purpose.

421. Defendants fraudulently concealed from and/or failed to disclose to or warn Plaintiff and the public that their products were defective, unsafe, and unfit for their intended purposes, and that they were not of merchantable quality.

422. Defendants were under a duty to Plaintiff and the public to disclose and warn of the defective and harmful nature of the products because:

a) Defendants were in a superior position to know the true quality, safety, and efficacy of Defendants' products;

b) Defendants knowingly made false claims about the safety and quality of Defendants' products in documents and marketing materials; and

c) Defendants fraudulently and affirmatively concealed the defective nature of Defendants' products from Plaintiff.

423. The facts concealed and/or not disclosed by Defendants to Plaintiff were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or use Defendants' products.

424. Defendants intentionally concealed and/or failed to disclose the true defective nature of the products so that Plaintiff would use Defendants' products. Plaintiff justifiably acted or relied upon, to Plaintiff's detriment, the concealed and/or non-disclosed facts as evidenced by Plaintiff's use of Defendants' products.

425. By concealing and/or intentionally failing to disclose material information about the

dangers, defects, and lack of safety and effectiveness of Defendants' products, Defendants prevented Plaintiff from acquiring such material information. Defendants are subject to the same liability to Plaintiff for Plaintiff's pecuniary loss as if Defendants had affirmatively stated the non-existence of such material information. Defendants are therefore liable for fraudulent concealment under all applicable laws.

426. As a proximate result of Defendants' conduct, Plaintiff has been injured, and sustained severe and permanent pain, suffering, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

**COUNT VIII – BREACH OF EXPRESS AND IMPLIED WARRANTIES**

427. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

428. At all times relevant hereto, Defendants manufactured, marketed, labeled, and sold the AFFF or TOG products that have been previously alleged and described herein.

429. At the time Defendants designed, developed, marketed, sold, labeled, and distributed the AFFF or TOG products, Defendants knew of the use for which they were intended, and implied and/or expressly warranted that the products were merchantable, safe, and fit for their intended purpose.

430. Defendants warranted that the products were merchantable and fit for the particular purpose for which they were intended and would be reasonably safe. These warranties were breached, and such breach proximately resulted in the injuries and damages

suffered by Plaintiff.

431. Plaintiff is within the class of foreseeable users and reasonably relied upon Defendants' judgment, and the implied and/or express warranties in using the products.

432. Defendants breached their implied and/or express warranties and did not meet the expectations for the performance of the products when used for their intended purpose and were neither of merchantable quality nor safe for their intended use in that the products have a propensity to cause serious injury, pain, and ulcerative colitis.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

**COUNT IX – WILLFUL AND WANTON MISCONDUCT**

433. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

434. Defendants and their employees, agents, officers, and representatives owed a duty of care to end users of their AFFF or TOG products, including Plaintiff.

435. Defendants breached the duty of care owed to Plaintiff.

436. The actions of Defendants and their employees, agents, officers, and representatives were willful and wanton and exhibited a reckless disregard for the life, health, and safety of the end users of Defendants' AFFF or TOG products, including Plaintiff.

437. As a proximate and foreseeable consequence of the actions of Defendants, Plaintiff was exposed to unreasonably dangerous toxic PFAS-containing AFFF and/or TOG, which caused Plaintiff's injuries.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and

further relief as this Court may deem fit, just, and proper.

**COUNT X - FRAUDULENT TRANSFER, 6 DEL. C. § 1304 (DUPONT DEFENDANTS)**

438. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

439. Under Delaware Code Title 6, § 1304:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

440. Plaintiff is a "Creditor" possessing "Claims" against DuPont Defendants as those terms are defined in Delaware Code Title 6, § 1301.

441. DuPont Defendants have acted with actual intent to hinder, delay, and defraud DuPont's creditors.

442. Assets and liabilities were transferred between DuPont Defendants, whereby certain DuPont Defendants did not receive a reasonably equivalent value in exchange for the transfer and they were engaged in, or were about to engage in, a business for which the remaining assets were unreasonably small and/or they intended to incur or reasonably should have believed that they would incur debts beyond their ability to pay as the debts became due.

443. Upon information and belief, DuPont Defendants engaged in a complicated

restructuring of DuPont for the purpose of shielding assets from creditors such as Plaintiff, with claims related to PFAS contamination.

444. Upon information and belief, at the time of this restructuring, DuPont Defendants knew that their liabilities related to PFAS were likely in the billions of dollars.

445. In the initial step of restructuring, DuPont formed Chemours in 2015 as a wholly owned subsidiary. In July 2015, DuPont spun off Chemours, transferring DuPont's Performance Chemicals Unit along with a vast amount of environmental liabilities – including all those related to PFAS. As part of the transfer, Chemours transferred valuable assets to DuPont, including a $3.9 billion dividend to DuPont stockholders, for which Chemours incurred additional debt to pay.

446. Upon information and belief, the Chemours spin-off was not bargained at arm's length. At the time of the spin off, Chemours had a separate board, but was controlled by DuPont employees.

447. Upon information and belief, DuPont transferred to Chemours a disproportionately small allocation of assets to cover debts and liabilities. Dupont transferred less than 20% of its business line, but over 66% of its environmental liabilities and 90% of DuPont's pending litigation. These liabilities were taken on by Chemours in addition to the $3.9 billion debt it assumed to pay a dividend to DuPont's shareholders. As a result, Chemours did not receive reasonably equivalent value in exchange for the transfer of debts and obligations from DuPont.

448. In its valuation, DuPont purposefully undervalued the potential maximum liability from the PFAS liabilities it transferred to Chemours. At the time of the spin-off, DuPont had been sued, threatened with lawsuits, and had knowledge of forthcoming litigation regarding DuPont's liabilities for damages and injuries from the manufacture, sale, and worldwide use of PFAS-containing products. DuPont and Chemours knew or should have known that Chemours would incur debts beyond its ability to pay as they came due.

449. In further restructuring, DuPont sought to further protect its assets from PFAS liabilities by first merging itself with Dow and then separating its now-comingled assets among three newly created companies: DowDuPont, Inc. ("DowDuPont") (which later became New DuPont); Dow, Inc. ("New Dow"), and Corteva.

450. As a result of the merger, Dow and DuPont became wholly owned subsidiaries of DowDupont. Upon information and belief, after the merger, DowDupont underwent a hidden internal reorganization with the net effect being the transfer of a substantial portion of its valuable assets to DowDupont for less than the assets were worth. Upon information and belief, the transactions were intended to frustrate and hinder creditors with claims against DuPont, including with respect to PFAS liabilities.

451. As a result of this internal organization, all of Dow and DuPont's assets were reshuffled into three divisions: the Agriculture Business, the Specialty Products Business, and the Material Sciences Business.

452. On June 1, 2019, the DuPont Defendants completed the final step of the restructuring by spinning off two newly publicly traded entities, Corteva and New Dow. Generally, the assets related to the Agriculture Business division were allocated to Corteva; the assets related to the Material Science Business were allocated to New Dow; and the assets related to the Specialty Products Business remained with DowDupont, which then became New DuPont. DuPont became a wholly owned subsidiary of Corteva.

453. Upon information and belief, Corteva and New DuPont assumed responsibility for some of DuPont's historic PFAS liabilities.

454. Upon information and belief, during the restructuring, DuPont's assets were transferred to Corteva and New DuPont for far less than their actual value. At the end of these transactions, DuPont divested approximately half of its tangible assets, totaling roughly $20

billion.

455. The net result of the restructuring was that DuPont's extensive PFAS liabilities were moved to an underfunded company, Chemours, and that DuPont's extensive assets were further shielded by merging them with Dow's assets and then transferring them to Corteva and New DuPont for far less than their value.

456. Plaintiff has been harmed by these transactions, which were designed to shield assets from creditors such as Plaintiff, and Plaintiff has been damaged by DuPont Defendants' conduct.

457. Plaintiff is entitled to void these transactions and to recover property or value transferred under 6 Del. C. § 1307.

WHEREFORE, Plaintiff prays judgments against DuPont Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT XI - PUNITIVE DAMAGES

458. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

459. At all times relevant to the present cause of action, Defendants manufactured, marketed, and sold the fluorochemical products that were used by Plaintiff and that resulted in the physical bodily injuries that Plaintiff has suffered and will continue to suffer.

460. At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that their fluorochemical products were toxic chemicals capable of causing harm to human health.

461. Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused Plaintiff to be exposed to fluorochemical products.

462. The willful, wanton, malicious, and/or reckless conduct of Defendants, includes, but is not limited to:

a. issuing no warnings and failing to divulge material information concerning the release of fluorochemicals, including but not limited to PFOA and PFOS;
b. failing to take all reasonable measures to ensure fluorochemical products would be used effectively and properly disposed of;
c. failing to prevent the foreseeable impacts of fluorochemical exposure upon the Plaintiff.

463. As a result of Defendants' conduct, Plaintiff has been forced to incur and will continue to incur significant costs related to the harm caused by Defendants' fluorochemical products and will continue to suffer serious, debilitating, and severe physical, mental, and emotional distress of her disease caused by Defendants' fluorochemical products.

464. Defendants have demonstrated an outrageous conscious disregard for the physical safety of Plaintiff and acted with implied malice, warranting the imposition of punitive damages.

465. Upon information and belief, Defendants' conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. The Court should award the Plaintiff punitive damages in an amount sufficient to deter and punish such conduct.

## <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>

### Discovery Rule Tolling

466. Plaintiff had no way of knowing about the risk of serious injury associated with the use of and exposure to PFAS until very recently.

467. Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to PFAS is harmful to human health.

468. Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and exposure to PFAS; nor would a reasonable and diligent investigation by Plaintiff have disclosed that PFAS could cause personal injury.

469. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

**Fraudulent Concealment Tolling**

470. All applicable statutes of limitations also have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

471. Instead of disclosing critical safety information regarding AFFF or TOG, Defendants have consistently and falsely represented the safety of AFFF or TOG products.

472. This fraudulent concealment continues through the present day.

473. Due to this fraudulent concealment, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

**Estoppel**

474. Defendants were under a continuous duty to consumers, end users, and other persons coming into contact with their products, including Plaintiff, to accurately provide safety information concerning their products and the risk associated with the use of and exposure to AFFF or TOG.

475. Instead, Defendants knowingly, affirmatively, and actively concealed safety

information concerning AFFF or TOG and the serious risks associated with the use of and exposure to AFFF or TOG.

476. Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgments against all Defendants, jointly and severally, on each of the above-referenced claims and Causes of Action as follows:

Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

Punitive and/or exemplary damages for the wanton, willful, fraudulent, and/or reckless acts of Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of Plaintiff and of the general public, and to Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

Awarding Plaintiff's attorneys' fees;

Awarding Plaintiff the costs of these proceedings; and

Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

*/s/ Gale D. Pearson*

Gale D. Pearson (MN Bar# 244673)
Majed Nachawati

John W. Raggio
NACHAWATI LAW GROUP
310 4th Avenue South, Suite 5010
Minneapolis, MN 55415
Tel: (214) 890-0711
Email: gpearson@ntrial.com